# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Indiana Insurance Co. v. Royce Realty & Management, Inc.*, 2013 IL App (2d) 121184

---

| | |
|---|---|
| Appellate Court Caption | INDIANA INSURANCE COMPANY, Plaintiff-Appellant, v. ROYCE REALTY AND MANAGEMENT, INC., and CATHY STACKHOUSE, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-12-1184 |
| Filed | May 30, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over the coverage provided by a comprehensive general liability policy containing an endorsement limiting coverage to claims arising from the ownership of premises shown in a schedule and operations necessary or incidental to those premises, the trial court properly held that the policy covered a claim made by a person who was struck by a falling tree while walking on a golf course managed by the insured, notwithstanding the fact that the golf course was away from the premises listed in the endorsement, since the policy contained several provisions suggesting that off-premises accidents would be covered, the only geographic limitation was the "coverage territory," which was defined as the United States, its territories and possessions and Canada, and plaintiff insurer knew its insured was engaged in the management of numerous commercial properties, including golf courses, townhouses and shopping centers. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 10-MR-783; the Hon. Christopher C. Starck, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Jay S. Judge, Andrew G. Witik, and Deborah A. Ostvig, all of Judge, James & Kujawa, LLC, of Park Ridge, for appellant. |
| | John A. Kornak, Thomas J. Popovich, and Mark J. Vogg, all of Law Offices of Thomas J. Popovich, P.C., of McHenry, for appellees. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Justices Hudson and Birkett concurred in the judgment and opinion. |

## OPINION

¶ 1    The plaintiff, Indiana Insurance Company, filed a declaratory judgment action seeking a determination as to whether a claim for personal injury suffered by one of the defendants, Cathy Stackhouse, was covered under an insurance policy Indiana had issued to the other defendant, Royce Realty and Management, Inc. On October 2, 2012, the circuit court of Lake County granted summary judgment in favor of the defendants, finding that the claim was covered under the policy. Indiana appeals this determination. We affirm.

¶ 2                                     BACKGROUND

¶ 3    The following facts are drawn from the depositions[1] and other evidence submitted in connection with the defendants' motion for partial summary judgment. Except where noted, these facts are undisputed.

¶ 4    Royce Realty is in the business of managing various commercial properties owned by others, including, *inter alia*, residential buildings, shopping centers, and two golf courses. Kim Plencner has worked for Royce Realty for many years and since the late 1990s has been the president of Royce Realty. Among other duties, he handled the obtaining of insurance for Royce Realty.

---

[1]Our review is hampered by the fragmentary nature of the deposition testimony. Almost all of the deposition testimony attached as exhibits to the parties' briefs on the motion for summary judgment consisted of excerpts. (The only complete deposition included in the record is that of Indiana's employee Jill Kaestner.) We inquired of Indiana as to whether the trial court had received courtesy copies of the complete deposition transcripts and were told that it had not. We therefore confine ourselves to the same record, despite its limitations.

¶ 5 At all times relevant to this case, Kim's brother Kevin Plencner was the vice president of Royce Realty, responsible for many of the day-to-day operations. He also served as the general manager of the Lakemoor Golf Club, supervising the operation of the golf course. He hired two other employees to directly manage, maintain, and operate the golf course. Those employees' paychecks came from Royce Realty. Although Kevin Plencner occasionally visited the golf course, he generally oversaw the golf course's operations from his office in Oak Brook Terrace.

¶ 6 Douglas Nelson was a licensed insurance broker. In 2002, he began working for Assurance Agency, Ltd. His accounts included Royce Realty, for which he prepared insurance proposals that he presented to Kim Plencner. In his deposition, Kim Plencner testified that he wanted Assurance to set up an insurance program that would protect against risks and losses at the various properties managed by Royce Realty.

¶ 7 The record does not reflect the nature of the insurance policies procured by Assurance for Royce Realty between 2002 and 2005. However, in May 2005, Indiana issued a set of insurance policies to Royce Realty that included coverage labeled "commercial general liability" (CGL) coverage. It appears that this was the first time Indiana insured Royce Realty.

¶ 8 Section I of the CGL coverage form stated that the policy included three types of coverage: coverage for bodily injury and property damage (coverage A); personal and advertising injury (defined to include injury arising out of offenses such as false imprisonment, malicious prosecution, wrongful eviction, defamation, invasion of privacy, and copyright infringement) (coverage B); and medical expenses (coverage C). The portion relating to coverage A stated that the policy applied to bodily injury and property damage if, among other things, the bodily injury or property damage was caused by an accident that took place in the "coverage territory." The "coverage territory" was defined as encompassing the United States, its territories and possessions, and Canada. The portion relating to coverage C stated as follows:

"a. We will pay medical expenses as described below for 'bodily injury' caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) *Because of your operations*;

provided that:

(1) The accident takes place in the 'coverage territory' and during the policy period ***." (Emphasis added.)

¶ 9 Section II of the coverage form, labeled "Who Is An Insured," stated that employees were insured, "but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business." The policy further defined the phrase "your work" as, among other things, "[w]ork or operations performed by you or on your behalf."

¶ 10 The CGL policy also contained an endorsement (Endorsement) labeled "Limitation of Coverage to Designated Premises or Project." The Endorsement stated that the CGL

insurance applied only to claims "arising out of *** [t]he ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises." The schedule that was part of the Endorsement listed only a single location under "premises": 800-1000 Royce Boulevard, in Oak Brook Terrace, the main office of Royce Realty.

¶ 11 Nelson testified that, prior to placing the above insurance, he spoke with one of Indiana's underwriters[2] about the Endorsement. He knew that the Endorsement was on the policy and believed that its purpose was to limit liability to occurrences at the designated premises. He did not recall whether he told the underwriter that the policy could not include the Endorsement. The record does not contain any testimony by Nelson that he specifically told Kim Plencner or anyone else at Royce Realty about the presence of the Endorsement or his understanding of its purpose.

¶ 12 Kim Plencner testified that Nelson would present various insurance proposals both before and during a meeting with him, and he was the person who had the final decision-making power over any insurance obtained by Royce Realty. However, the record does not contain any evidence of any discussion between Nelson and Kim Plencner about the presence of the Endorsement or its effect on the policy. Nor is there any evidence that Kim Plencner ever met directly with anyone at Indiana. The only evidence that Kim Plencner knew of the Endorsement is that he ultimately signed off on the Indiana insurance policies proposed by Assurance, including the CGL policy with the Endorsement. (The Endorsement was listed in the table of contents of the CGL policy.) The CGL policy was renewed in substantially similar form twice, and was in effect in April 2008.

¶ 13 On April 26, 2008, Stackhouse was walking on the golf course at the Lakemoor Golf Club when a tree fell on her, seriously injuring her. She filed a personal injury lawsuit against Lakemoor and Royce Realty. Indiana initially defended the lawsuit on behalf of Royce Realty without a reservation of rights. On April 29, 2010, however, Indiana notified Royce Realty that it was withdrawing from that defense, contending that Kevin Plencner had substantially misled Indiana regarding the nature of Royce Realty's involvement with the golf course.

¶ 14 Shortly thereafter, on May 4, 2010, Indiana filed the declaratory judgment action that is before us in this appeal, contending that the policy did not cover Stackhouse's injury. In October 2010, Stackhouse obtained a $4.5 million verdict against Lakemoor and Royce Realty in the personal injury suit. Lakemoor's insurer paid approximately $3.5 million, and Stackhouse entered into a settlement with Royce Realty pursuant to which Royce Realty

---

[2]The underwriter was Kimberly Delvaux. Indiana submitted her affidavit, along with various notes from the underwriting file mentioned by Delvaux in her affidavit, as exhibits to its responses to the defendants' motion for summary judgment. On September 18, 2012, the trial court granted Stackhouse's motion to strike the Delvaux affidavit for the purposes of deciding the motion for summary judgment. Indiana has not appealed this order. We therefore do not consider either the Delvaux affidavit or the notes referred to therein, which must be viewed as inadmissible hearsay. In addition, we consider other deponents' testimony about conversations or meetings with Delvaux only to the extent that the testimony is not hearsay. *People ex rel. Madigan v. Kole*, 2012 IL App (2d) 110245, ¶ 47.

assigned her its rights under the $1 million CGL policy issued by Indiana. Stackhouse was then joined as a defendant in the declaratory judgment action, and filed an answer, affirmative defenses, and counterclaims alleging bad faith.

¶ 15    On January 25, 2012, the defendants filed a motion for summary judgment on the issue of coverage. The motion was briefed and argued. During this period, a number of witnesses were deposed. Among them were Jill Kaestner, a senior claims specialist for Indiana who eventually handled Stackhouse's claim, and Mary Prugh, the director of claims for Assurance (the insurance broker).

¶ 16    Kaestner testified that she was uncertain about the effect of the Endorsement on the policy and that she therefore identified it as creating a potential coverage issue. Kaestner knew that Stackhouse had been injured at the Lakemoor golf course, not at Royce Realty's main office in Oak Brook Terrace. However, she did not know how the Endorsement affected coverage for the accident, as Royce Realty could have acted as the property manager for the Lakemoor golf course from its main office. (In fact, Kevin Plencner testified that he generally performed his property management tasks related to the Lakemoor golf course from his office, although he also occasionally visited the golf course.) Kaestner also testified that, in her more than 20 years as an insurance adjuster, she had never seen an endorsement such as the one at issue in this case.

¶ 17    Kaestner explained that, although she had identified possible coverage issues, Indiana agreed to defend Royce Realty in the personal injury action because there was at least potential coverage. Indiana defended Royce Realty without a reservation of rights because Kevin Plencner initially told her that Royce Realty did not own or operate the Lakemoor golf course. Indiana therefore took the view that it could be dismissed from the lawsuit fairly quickly and thus would not need to reserve its rights. However, once it became clear (through the depositions of Kevin Plencner and other golf course employees) that Royce Realty served as the property manager for the golf course, Indiana decided to withdraw from representing Royce Realty, citing the Endorsement.

¶ 18    Prugh reviewed the policy and Endorsement after the incident, when questions about coverage arose. She testified that the policy was a CGL policy. CGL policies typically provide the insured with protection against lawsuits based on the insured's business operations. Different insureds have different business operations; in this case, Royce Realty provided property management services at several locations, including the Lakemoor golf course. On June 18, 2010, Prugh wrote in an e-mail: "Regarding the Indiana Insurance GL policy on which Royce is a named insured, it would appear likely that the designated operations [*sic*] location endorsement (which serves to limit coverage for Royce's operations to only those operation [*sic*] occurring at Royce's offices) would serve to preclude coverage for this loss as the claimant was injured away from the named insured's location." However, when asked at her deposition about whether an injury such as a "personal and advertising injury" (a defined term under the policy and Endorsement) could occur off-premises and yet be covered despite the Endorsement, Prugh answered that that "was certainly possible" but that "[i]t would be up to the courts to decide." Prugh also opined that the Endorsement's limitation of coverage to operations taking place at Royce Realty's office did not create a problem for Royce Realty with respect to its off-premises liability at the properties it

managed, because each of those properties would have separate insurance, and as property manager Royce Realty would be an "insured" under those other policies.

¶ 19 On October 2, 2012, the trial court granted the defendants' motion for summary judgment, stating:

"The court has to read the insurance policies liberally in favor of the insured and reading this [']limitation of coverage to designated premises or project[,'] Indiana's claim is that this specifically limits any claims for injuries that happened on the–in the office itself and that doesn't fly. It doesn't make sense compared to some of the other provisions of the policy particularly when I believe that this incident was a result of the insured's business operation that was conducted within the premises. Now, [Stackhouse] wasn't hurt within the premises but it arises from the operation of the insured's business at that premises.

It doesn't make sense to me that the insured would purchase a big umbrella policy for personal injuries that would happen within the office, that doesn't make sense at all to the Court. And it would have been easy for the insurance company to specifically set forth that this policy does not apply to any other locations or any other damages or any other place where injuries may have occurred which would include the golf course, the rental properties, the homeowner's associations or whatever else they managed and they chose not to do that.

So I'm finding in favor of the defendant. I think there's coverage."

The trial court then made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) to the effect that there was no just reason to delay enforcement or appeal of the order. Indiana filed a timely notice of appeal.

¶ 20 ANALYSIS

¶ 21 On appeal, Indiana argues that the trial court erred in granting summary judgment in favor of the defendants on the issue of coverage under the policy. A motion for summary judgment is properly granted where the pleadings, depositions, admissions, and affidavits establish that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2008); *Ioerger v. Halverson Construction Co.*, 232 Ill. 2d 196, 201 (2008). Indiana does not argue that a triable issue of fact exists that would preclude the entry of summary judgment. Rather, it argues that the trial court misconstrued the policy and therefore made a legal error when it held that Stackhouse's injury was covered by the policy. A trial court's grant of summary judgment is reviewed *de novo*. *Ioerger*, 232 Ill. 2d at 201. The interpretation of a contract such as an insurance policy is a purely legal matter also subject to *de novo* review. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005).

¶ 22 When construing the language of an insurance policy, a court's primary function is to give effect to the intent of the parties as expressed by the words of the policy. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). "An insurance policy, like any contract, is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Id.* If the language

of the policy is clear and unambiguous, it must be given its plain, ordinary, and popular meaning. *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 371 (2007). However, if the words used in the policy are susceptible of more than one reasonable interpretation, the ambiguity must be resolved in favor of coverage. *Id.*

¶ 23 Indiana argues that the plain language of the Endorsement limits coverage to claims arising out of "the ownership, maintenance or use" of Royce Realty's offices. It further argues that, because the accident that caused Stackhouse's injury did not take place at Royce Realty's offices, her claim is not covered by the policy. The defendants contend that the Endorsement is ambiguous in light of other policy provisions demonstrating an intent to cover Royce Realty's business operations, and the ambiguity must be resolved in favor of coverage. They also argue that the accident came within the terms of the Endorsement, because Stackhouse's injury arose out of Royce Realty's "use" of its offices in that Kevin Plencner oversaw property management operations at the Lakemoor golf course from his office.

¶ 24 In determining the scope of coverage under the policy, we are guided by the supreme court's instructions in *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993):

> "To ascertain the intent of the parties and the meaning of the words used in the insurance policy, the court must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract."

The supreme court further noted that, when construing the scope of coverage, courts begin by focusing on "the type of policy for which the parties have contracted." *Id.* at 392. In *Crum & Forster*, the policies at issue were professional liability policies that were designed to protect members of a particular profession from liability for negligence, omissions or errors that were " 'inherent in the practice of the profession.' " (Emphasis omitted.) *Id.* (quoting 7A John Alan Appleman, Insurance Law and Practice § 4504.01, at 310 (Walter F. Berdal ed., 1979)). The supreme court ultimately found that the claim in that case was not covered, because it did not arise out of the insured's performance of professional services.

¶ 25 Here, "the type of policy for which the parties have contracted" is a CGL policy. As some of the insurance industry witnesses in this case testified at their depositions, a CGL policy typically protects against claims for injuries or losses arising from the insured's business operations. Kim Plencner testified that Royce Realty sought to obtain coverage for its operations on the properties it managed: *i.e.*, CGL coverage. The policy at issue was in fact labeled as a CGL policy, and contained language insuring against liability arising from Royce Realty's operations.

¶ 26 For this reason, we find inapposite much of the case law cited by Indiana in which courts have given effect to endorsements similar to the one at issue here. One of the leading cases Indiana cites is *United States Fire Insurance Co. v. Schnackenberg*, 88 Ill. 2d 1 (1981). The primary issue in *Schnackenberg* was whether a family member's bicycle accident 2½ blocks from the home was covered under the homeowners' insurance policy. The supreme court held that an off-premises accident such as the bicycle accident was not covered. *Id.* at 8.

However, the court was interpreting a homeowners policy (also known as an owners, landlords, and tenants policy). Homeowners policies are designed to protect against claims for accidents occurring on the covered premises. Thus, there was no conflict between the nature of the policy (a premises liability policy) and the endorsement restricting coverage to the specified premises. In light of this context, *Schnackenberg* simply stands for the proposition that the language of the endorsement indeed means "*on* the premises," not "*near* the premises." *Id.*

¶ 27    Another case cited by Indiana, *Allstate Insurance Co. v. Smiley*, 276 Ill. App. 3d 971 (1995), likewise focused on the nature of the policy at issue. *Smiley* involved an accident in which a child drowned in a swimming pool on the insureds' premises. The child was on the premises because the insureds had been caring for him as part of their home daycare business. The issue was whether the accident was covered under the insureds' homeowners policy. This court held that the policy's exclusion for losses arising from business operations meant that the accident was not covered, even where the loss *was* on the premises, because it arose out of the insureds' operation of a business (the home daycare center). *Id.* at 979. Our decision was based on the nature of the policy at issue, which was a premises liability policy designed to cover only losses and injuries associated with the property itself, and not those related to the business operations of the insureds. Thus, as in *Schnackenberg*, the exclusion at issue was consistent with the nature of the policy as a whole, and the holding must be seen against that backdrop.

¶ 28    On appeal, Indiana asserts that it intended the Endorsement to transform the underlying CGL policy, which insured against risks from Royce Realty's business operations, into a premises liability policy that insured only risks related to Royce Realty's use of its offices. Indiana notes that Kim Plencner signed off on the package of insurance policies that contained the Endorsement, and argues that Royce Realty thus must be viewed as having understood and accepted this interpretation of the effect of the Endorsement. However, in interpreting the policy, we must be guided not by what the insurer intended but by what a reasonable person in the shoes of the insured would understand the policy to mean. *Aurelius v. State Farm Fire & Casualty Co.*, 384 Ill. App. 3d 969, 973 (2008). We do not believe that a reasonable person, having intended to protect against risks associated with his business operations and having bought a policy labeled as a CGL policy that purported to insure such risks, would read the Endorsement as nullifying most of that coverage. See *Rich*, 226 Ill. 2d at 372 ("A court will consider only reasonable interpretations of the policy language ***.").

¶ 29    We find the meaning of the Endorsement ambiguous, in that it limits coverage to losses arising out of Royce Realty's "use" of the premises and arising out of "operations *** incidental to those premises" without defining those terms, and reasonable people could differ over the meaning of the terms. *Id.* (a term is ambiguous if it is "reasonably susceptible to more than one meaning"). Reading the Endorsement together with the rest of the CGL policy to which it applies, as we must (*Central Illinois Light*, 213 Ill. 2d at 153), a reasonable person would likely understand the terms "use" and "operations incidental to the premises" to encompass business operations conducted from the designated premises, even where those operations involve off-premises activities. Indeed, one of Indiana's own adjusters testified that she could not tell how the Endorsement affected coverage under the CGL policy. Where

-8-

a provision that limits or excludes coverage is ambiguous, it will be construed most strongly against the insurer. *Rich*, 226 Ill. 2d at 371; *Smiley*, 276 Ill. App. 3d at 977. Accordingly, we construe the Endorsement as encompassing accidents arising out of Royce Realty's use of the premises to conduct its property management activities, despite the fact that the accident at issue here arose away from those premises.

¶ 30      In so holding, we find helpful the opinion in *Dash Messenger Service, Inc. v. Hartford Insurance Co. of Illinois*, 221 Ill. App. 3d 1007 (1991). There, the plaintiff, which operated a bicycle messenger service, had a "multiflex" policy that included a designated-premises-only endorsement similar to the one in this case. When one of its messengers was involved in an accident, the insured tendered the defense of the resulting lawsuit to the insurer. The insurer refused to defend the claim on the ground that the endorsement precluded coverage of off-premises accidents. The messenger service filed a declaratory judgment claim. Although the trial court had granted summary judgment for the insurer, the appellate court reversed.

¶ 31      The appellate court noted first that several provisions of the underlying policy suggested that off-premises accidents could be covered, so long as they were not barred by a specific exclusion. For instance, a provision excluding coverage of accidents involving "mobile equipment" (including bicycles) that stemmed from racing or demolition contests suggested that, where the mobile equipment was involved in some other type of accident, there would be coverage. Similarly, once employees were added to the definition of "persons insured," an exclusion for injury caused by an employee's operation of a snowmobile during the course of his employment suggested that other injuries caused by employees during the course of their work off-premises would be covered. *Id.* at 1015 (as snowmobiling was unlikely to occur at the second-floor office of the insured, any accidents from that activity would be expected to occur off-premises; exclusion of this particular off-premises risk left open possibility that other off-premises accidents would be covered).

¶ 32      Similarly, the policy at issue in this case contained several provisions suggesting that off-premises accidents would be covered. For instance, the CGL policy stated that it covered medical expenses for bodily injury caused by an accident *either* (a) on or adjacent to premises Royce Realty owned or rented, *or* (b) because of Royce Realty's operations. This provision plainly indicated that off-premises accidents would be covered if they arose because of Royce Realty's business operations. The policy also stated that employees of Royce Realty were insured for any acts performed within the scope of their employment. Finally, the policy stated that the only geographic limitation on any of this coverage was that the accident must occur within the "coverage territory," defined as the United States, its territories and possessions, and Canada. All of these terms are integral parts of the insurance contract that must be considered in determining the scope of coverage. *Central Illinois Light*, 213 Ill. 2d at 153.

¶ 33      The second significant factor noted by the court in *Dash* was that the insurer knew that the nature of the insured's business–a bicycle messenger service–would involve substantial off-premises risks when it wrote the policy, but the insurer did not clearly exclude those risks. "In Illinois, as in many other jurisdictions, if an insurer does not intend to insure against a risk likely to be inherent in the insured's business, the insurer should expressly

exclude that risk from the coverage of the policy." *Dash*, 221 Ill. App. 3d at 1014. The same principle applies here, where Indiana knew that Royce Realty was in the business of providing property management services to a variety of commercial properties, including golf courses, townhouses, and shopping centers. The potential for accidents that could give rise to lawsuits against such a property manager is obvious. Indeed, the very type of accident experienced by Stackhouse was "a risk likely to be inherent in the insured's business." Nevertheless, Indiana chose to issue Royce Realty a CGL policy–a type of policy intended to protect against risks associated with business operations–but then apparently sought to quietly convert it to a premises liability policy (that would leave such risks without coverage) by simply inserting the Endorsement into the policy. Like the court in *Dash*, we find that the designated-premises endorsement did not qualify as an express exclusion that would put the insured on notice that the fundamental nature of the policy had changed and that most of the coverage under the CGL policy was nullified. *Cf. Southeast Farms, Inc. v. Auto-Owners Insurance Co.*, 714 So. 2d 509, 512 n.4 (Fla. Dist. Ct. App. 1998) (noting the difference between premises liability insurance and CGL insurance, and finding that an endorsement in a CGL policy that "attempted to turn it into a premises liability policy" was ambiguous). As the language of the Endorsement was ambiguous, we find that the trial court correctly resolved the ambiguity in favor of coverage. See *Rich*, 226 Ill. 2d at 371; *Smiley*, 276 Ill. App. 3d at 977.

¶ 34     Arguing against this conclusion, Indiana points to *Pekin Insurance Co. v. Recurrent Training Center, Inc.*, 409 Ill. App. 3d 114 (2011), a recent case from the First District of the Appellate Court. That case involved the interpretation of a CGL policy that included a designated-premises endorsement similar to the one at issue here. The policy had been purchased by a business that trained airplane pilots. One of the pilots it trained was involved in an accident, and the training center was sued on the theory that it had negligently trained the pilot. The training center argued that it had purchased a CGL policy, and that the endorsement could not be construed as changing the fundamental nature of the policy to a premises liability policy, because such a construction would effectively render meaningless the underlying CGL coverage. The reviewing court rejected this argument on the ground that "where an endorsement irreconcilably conflicts with a provision in the body of the policy *** the terms of the endorsement control." *IMC Global v. Continental Insurance Co.*, 378 Ill. App. 3d 797, 807 (2007). Remarkably, although the court stated that the policy issued by the insurer was a CGL policy (*Recurrent Training Center*, 409 Ill. App. 3d at 115)–in other words, a policy that insured business operations–the court later held that the plane crash was not an "inherent risk" of the training center's business, and that the insurer did not insure the training center's business operations (*id.* at 121).

¶ 35     We decline to follow *Recurrent Training Center*. We note that the court in that case relied heavily on two cases, *Schnackenberg* and *Heritage Insurance Co. v. Bucaro*, 101 Ill. App. 3d 919 (1981), but apparently failed to realize that both cases involved insurance policies that were clearly labeled as premises liability policies, not CGL policies. *Recurrent Training Center*, 409 Ill. App. 3d at 119, 121. *Recurrent Training Center* thus imports the holding of premises liability cases directly into a case involving CGL insurance without taking into consideration the fundamental difference in the risks these two types of insurance

are designed to cover.

> "The purpose of such insurance [owner, landlord, and tenant insurance] is simply to protect against liability arising from the condition or use of the building as a building. Accordingly, landlord-tenant insurance must be distinguished from insurance against liability arising from the nature of the enterprise or activity conducted within the insured premises. Liability arising out of a business enterprise is commonly covered by commercial general liability policies." 9A Couch on Insurance § 132:59 (3d ed. 1997).

The court's approach in *Recurrent Training Center* thus is contrary to the rule that courts must consider "the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Crum & Forster*, 156 Ill. 2d at 391. In our view, the result in *Recurrent Training Center* is based either on a failure to recognize the significance of the nature of the insurance policy at issue, or perhaps on unmentioned differences between the CGL policy in that case and Indiana's policy here. In either event, however, we do not find *Recurrent Training Center* persuasive and therefore decline to follow it.

¶ 36                                    CONCLUSION

¶ 37        For the reasons stated, we affirm the judgment of the circuit court of Lake County.


¶ 38        Affirmed.