2021 IL App (1st) 200552-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
February 23, 2021

No. 1-20-0552

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

---

| | | |
|---|---|---|
| MHM CORRECTIONAL SERVICES, INC., CENTURION OF MINNESOTA, LLC, CENTURION OF MISSISSIPPI, LLC, and MASSACHUSETTS PARTNERSHIP FOR CORRECTIONAL HEALTHCARE, LLC, | ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 15 CH 18000 |
| EVANSTON INSURANCE COMPANY, | ) ) ) | The Honorable Sophia H. Hall, Judge Presiding. |
| Defendant-Appellant | ) ) | |
| (MHM Correctional Services, Inc., and Massachusetts Partnership for Correctional Healthcare, LLC, Plaintiffs-Appellees). | ) ) ) | |

---

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Insurance policy's language imposed on insurer a duty to defend in underlying class-action lawsuits brought by prisoners seeking declaratory and injunctive relief concerning medical and mental health services received while imprisoned, regardless of whether such lawsuits sought monetary damages.

¶ 2    This interlocutory appeal involves the questions of whether the defendant, Evanston

Insurance Company (Evanston), owes duties to defend: (1) plaintiff MHM Correctional Services, Inc. (MHM), the Alabama Department of Corrections (Alabama DOC), and its commissioners in an underlying lawsuit, Dunn et al. v. Thomas et al., No. 2:14-cv-00601-MHT-TFM (M.D. Ala.) (Dunn lawsuit); and (2) plaintiff Massachusetts Partnership for Correctional Healthcare, LLC (MPCH), the Massachusetts Department of Correction (Massachusetts DOC), or certain of its employees or officials in two underlying lawsuits, Briggs, et al. v. Massachusetts Department of Correction, et al., No. 1:15-cv-40162-GAO (D. Mass.) (Briggs lawsuit), and Paszko, et al. v. O'Brien, et al., No. 1:15-cv-12298-NMG (D. Mass.) (Paszko lawsuit).[1] All three of these underlying lawsuits are purported class actions by and on behalf of incarcerated individuals that, generally speaking, seek injunctive relief to bring about changes in the medical or mental health care they receive while imprisoned. For the reasons that follow, we affirm the trial court's declaratory judgment that Evanston owed a duty to defend in all three underlying lawsuits.

¶ 3                                    I. BACKGROUND

¶ 4        Plaintiffs MHM and MPCH are providers of healthcare services within correctional institutions. During the time periods relevant to this case, Evanston issued two policies of insurance, and MHM and MPCH were named insureds under these policies. The relevant coverage part of the policies is referred to in the policy as the "*Locum Tenens* and Contract Staffing Professional Liability Insurance Coverage Part" and in some of the endorsements as "Correctional Healthcare Professions Professional Liability Insurance Coverage Part." The relevant provisions of the two policies are identical in all material aspects, and thus we will refer simply to "the policy."

¶ 5                A. MHM's contract with the Alabama DOC and the Dunn lawsuit

---

[1] Plaintiffs Centurion of Minnesota, LLC, and Centurion of Mississippi, LLC, are not parties to this appeal. Also, the action pending in the trial court involves three additional underlying lawsuits that are not at issue in this appeal.

¶ 6         From 2013 to 2016, MHM had a contract with the Alabama DOC to develop, implement, and manage a system to provide comprehensive mental health care to inmates within its custody. That contract required MHM to name the Alabama DOC as an additional insured in its medical malpractice liability insurance. It additionally provided that MHM would "indemnify and hold harmless" the Alabama DOC and its officers and employees "from and against any and all loss or damages *** for liability claimed against or imposed upon the [Alabama DOC] because of bodily injury *** arising out of or as a consequence of" the breach of any contractual duty or negligence by MHM or its agents in the performance of the contract. The indemnity and hold-harmless provision did "not extend to any liability caused by the negligence of the [Alabama DOC] or its employees."

¶ 7         In 2014, the Alabama DOC and two of its commissioners were named as defendants in the Dunn lawsuit, a proposed class action filed by and on behalf of prisoners within the custody of the Alabama DOC. The operative third amended complaint in that case alleged that the Alabama DOC and its commissioners were failing to provide constitutionally adequate medical and mental health care to individuals within the custody of the Alabama DOC. The allegations of the operative complaint, which in total comprise 456 paragraphs spanning 138 pages, are summarized in the introductory paragraphs as follows:

        "3.         Because of the defendants' deliberate indifference to the obvious medical needs of the persons in their custody, plaintiff prisoners go for months or years without appropriate diagnoses of medical conditions. Numerous prisoners have died from a failure to treat medical conditions from cancer to diabetes to hepatitis. Others have required emergency surgery or lost the use of legs, arms or eyes, after having been left to suffer with untreated symptoms for lengthy periods. Prisoners with mental illnesses or serious

psychological problems are entirely denied mental health care or provided only with medication with little or no medication management, follow-up, or concern for side effects, some of which are debilitating. Mental health care other than medications is nearly non-existent. *** [The commissioner defendants] violate the prohibition on Cruel and Unusual Punishments in the Eighth Amendment to the Constitution of the United States.

4.      Prisoners, who do not want to take psychiatric medication, often because they are experiencing serious side effects, are forced to take the medication without any regard for due process. If they refuse, they may be beaten, placed in segregation or both. *** [The commissioner defendants] violate the Due Process Clause in the Fourteenth Amendment to the Constitution of the United States as it relates to mentally ill prisoners' rights to bodily integrity.

* * *

7.      Plaintiffs seek declaratory and injunctive relief to compel [the defendants] to provide constitutionally adequate medical and mental health care to all prisoner plaintiffs and the class members they represent, to desist from medicating mentally ill prisoners against their will without due process, and to comply with the [Americans with Disabilities Act ('ADA')] and [section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 (2012)]."

MHM was not named as a defendant in the Dunn lawsuit, but it is referenced in the following allegation of the third amended complaint:

"234.      When [the Alabama DOC] issued its request for proposals for a mental health services contract in 2013, it identified the minimum staffing needs from the provider to be 144.95 full-time equivalent employees. Under the current contract, MHM Correctional Services ('MHM') is not providing even this inadequate number of mental

health staff. The staffing provided under the new MHM contract is just 126.5 full-time equivalent employees."

¶ 8        The third amended complaint goes on to allege multiple causes of action. Among these are allegations that the defendants' policies and practices have subjected the plaintiffs and the plaintiff class "to a substantial risk of serious harm and injury from inadequate medical care in violation of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution." It also alleges that the commissioner defendants' policies and practices have subjected certain plaintiffs and a "mental health subclass," respectively, to "a substantial risk of serious harm and injury from inadequate mental health treatment in violation of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments," and to a deprivation "of their due process rights by involuntarily medicating prisoners in violation of the Fourteenth Amendment."

¶ 9        The prayer for relief to the third amended complaint does not expressly request any form of monetary damages. It requests certification of a class under Federal Rule of Civil Procedure 23(b)(1) and (b)(2) (eff. Dec. 1, 2009). It also requests in pertinent part that the court order the defendants "to develop and implement *** a plan to eliminate the substantial risk of serious harm" that the plaintiffs and the class "suffer due to inadequate medical and mental health care." It requests that this plan include, at a minimum, (1) staffing sufficient to provide prisoner plaintiffs and the class with timely access to qualified and competent clinicians, (2) policies and practices that provide timely access to health care, (3) policies and practices that reliably screen for medical, dental, and mental health conditions requiring treatment, (4) timely and competent responses to health care emergencies, (5) timely prescription and distribution of medications and supplies, (6) timely access to competent care for chronic diseases, (7) basic sanitary conditions that do not promote the spread of disease or infections, (8) timely access to treatment for serious mental

illness, (9) quality assurance to improve outcomes and identify errors and deficiencies, and (10) appropriate accommodations for individuals with disabilities. The complaint also seeks an award of attorney fees, costs, and litigation expenses under 42 U.S.C. § 1988 (2012). Finally, the prayer for relief requests that the court "[a]ward such other and further relief as the Court deems just and proper."

¶ 10      Upon being sued in the Dunn lawsuit, the Alabama DOC tendered its defense and the defense of its two commissioners to Evanston, pursuant to MHM's contractual requirement to indemnify and hold harmless the Alabama DOC and its officers. Evanston initially defended MHM, the Alabama DOC, and its commissioners in the Dunn lawsuit under a reservation of rights. In 2015, Evanston's attorneys informed MHM that it was withdrawing its defense of any of the defendants in the Dunn litigation.

¶ 11                          B. Briggs and Paszko lawsuits

¶ 12      From 2013 to 2018, MPCH had a contract with the Massachusetts DOC to provide a comprehensive program of medical, dental, and mental health services to inmates and civilly-committed individuals within the care and custody of the Massachusetts DOC. That contract provided that MPCH was to name the Massachusetts DOC as an additional insured in its professional liability insurance. It also provided that neither party "shall act as an employee or agent of the other" in the performance of their obligations under the contract. A 2014 amendment to the contract added a provision whereby MPCH agreed to indemnify and hold harmless the Massachusetts DOC and its agents, officers, and employees from "any and all claims, liabilities and costs for any personal injury *** or other damages that the State may sustain which arise out of or in connection with [MPCH's] performance of a Contract."

¶ 13      In 2015, the Briggs lawsuit was filed, naming MPCH, the Massachusetts DOC, and six of its

officials as defendants. The plaintiffs and the proposed class in the Briggs lawsuit are individuals who are deaf or hard of hearing within the custody of the Massachusetts DOC. They allege that the defendants have discriminated against them in violation of federal law by denying them adequate, effective, and reliable means of communication. Pertinent to this appeal, their complaint alleges that these discriminatory policies and practices by the defendants have resulted in prisoners who are deaf or hard of hearing being "[e]xcluded from full participation in medical, mental health, and counseling services and programs offered by the [Massachusetts DOC] and medical contractor Massachusetts Partnership for Correctional Healthcare ('MPCH')." It alleges that "[the Massachusetts DOC] and MPCH have refused to provide medically required hearing aids to deaf and hard of hearing prisoners" and failed "to fix broken hearing devices promptly." It alleges that MPCH is responsible for arranging interpretation services for deaf and heard of hearing prisoners to communicate accurately and effectively with medical staff but that such services are rarely if ever provided to prisoners who need them.

¶ 14    The complaint includes nine causes of action against various defendants. One of the causes of action is that all defendants have violated the rights of the plaintiffs "to be free from cruel and unusual punishment, as protected by the Eighth and Fourteenth Amendments to the United States Constitution, as enforceable through 42 U.S.C. § 1983, by being deliberately indifferent to Plaintiffs' serious medical needs," through the failure to provide interpretive services and assistive devices during medical and mental health treatment. The prayer for relief in the complaint does not expressly request any form of monetary damages. It prays for a class to be certified under Federal Rule of Civil Procedure 23(b)(2) (eff. Dec. 1, 2009). It also in pertinent part requests that the court "[e]njoin the Defendants from refusing to provide the proper interpretive services, TDD [(telecommunications devices for the deaf)], videophones, and other assistive devices that are

required for deaf and hard of hearing prisoners to fully participate in and benefit from the programs and services offered by these public entities, and required to ensure their physical safety." It also requests an award of attorney fees and costs. Finally, the prayer for relief requests the court to "[a]ward Plaintiffs such other and further relief as the Court deems just and proper."

¶ 15　　　Also in 2015, the Paszko lawsuit was filed, naming MPCH and the commissioner of the Massachusetts DOC as defendants. The complaint in the Paszko lawsuit alleges that the case "is a class action that seeks declaratory and injunctive relief under 42 U.S.C. § 1983 for violation of the Eighth Amendment as a result of the deliberate indifference of the defendants *** to the serious medical needs of the plaintiffs and members of the class, who are infected with Hepatitis C." The complaint alleges that a major advancement in the treatment of Hepatitis C occurred in 2014, with the introduction of medication regimens that have near-perfect success rates, far fewer side effects, and a much shorter duration, but the "defendants have failed and refused to provide this new treatment to plaintiffs and the members of their class." The complaint alleges that by failing and refusing to provide this new treatment, they are violating the rights of the plaintiffs and the class to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and by 42 U.S.C. § 1983.

¶ 16　　　Again, the prayer for relief does not expressly request any form of monetary damages. In pertinent part it requests that the court "[i]ssue preliminary and permanent injunctions ordering defendants to implement and adhere to a comprehensive treatment protocol that includes timely and adequate screening of [Massachusetts] DOC prisoners, timely evaluation, staging, and monitoring of Hepatitis C prisoners, timely treatment with the most effective medications, timely and adequate treatment of side effects to ensure that the Hepatitis C treatment is successful, and elimination of unjustified exclusions from or denials of treatment." It requests attorney fees and

costs and that the court "[g]rant such other and further relief as this Court considers just and proper."

¶ 17     In letters dated December 21, 2015, and January 22, 2016, Evanston disclaimed the duty to defend MPCH or any other person or entity in the Paszko and Briggs litigation.

¶ 18                              C. Declaratory Judgment Action

¶ 19     In the operative first amended complaint of the instant action for declaratory judgment, MHM and MPCH sought in pertinent part a declaratory judgment that Evanston had a duty to defend MHM, the Alabama DOC, and its officials in the Dunn litigation and a duty to defend MPCH and officials of the Massachusetts DOC in the Paszko and Briggs litigation. Evanston filed an answer to the first amended complaint, and MHM and MPCH then filed a motion for summary judgment regarding Evanston's duty to defend.

¶ 20     In their motion for summary judgment, MHM and MPCH argued generally that the policies required Evanston to defend " 'any Claim to which coverage under this Coverage Part applies,' " that " 'Claim' " was defined to include an insured's receipt of a " 'demand for money damages or services involving Professional Healthcare Services' " or " 'service of suit *** involving Professional Healthcare Services,' " and that the class action lawsuits constituted both demands for services and the service of a suit involving professional healthcare services, thereby triggering Evanston's duty to defend. MHM and MPCH argued that the policies required Evanston to defend claims demanding services regardless of whether such claims also sought money damages (or that the policies were at least was ambiguous on this point), but in any event it was possible for the plaintiffs in the underlying lawsuits to seek money damages because of the complaints' prayers for relief requesting " 'other and further relief as the Court deems just and proper.' "

¶ 21     Evanston responded to the motion for summary judgment by arguing that the policies'

contractual liability exclusion barred coverage of the state departments of corrections and their officials in the underlying lawsuits. Evanston also argued that it was necessary for the underlying lawsuits to seek "damages" before its defense or indemnity obligations were triggered, and the fact that the lawsuits sought only declaratory and injunctive relief and did not seek money damages meant that Evanston had no duty to defend. Evanston further argued that the state departments of correction did not qualify as additional insured under the policies.

¶ 22    The trial court held multiple hearings on the matter and requested additional submissions by the parties pertaining to various issues. Ultimately, on September 29, 2017, the trial court entered an order partially granting summary judgment and declaring "that Evanston has a duty to defend MHM Insureds" in the Briggs and Paszko litigation "based on the Court's finding that the underlying complaints' prayer for other relief constitutes a claim for damages under the Evanston policies." On August 30, 2018, the trial court entered an order further granting summary judgment and finding that Evanston had a duty to defend the Alabama DOC in the Dunn litigation because "there is potential coverage of [the Alabama DOC] as an additional insured and the underlying complaint does not support application of the [contractual liability] Exclusion."

¶ 23    Evanston then filed a motion for reconsideration of the trial court's order of September 29, 2017. The trial court denied this motion without prejudice and ordered Evanston to filed a renewed motion for reconsideration, specifically addressing whether the underlying complaints contained allegations to support a cause of action for damages, whether the definition of "damages" in the Evanston policies is ambiguous or otherwise encompasses monetary costs to comply with injunctive relief, and whether the allegations from one of the other underlying lawsuits not involved in this appeal could be used to infer the potential to infer damages in the Briggs and Paszko cases. After further briefing to address these issues, the trial court denied Evanston's refiled

renewed motion for reconsideration on July 11, 2019. On February 26, 2020, the trial court entered an order finding no just reason for delaying the enforcement or appeal of its orders of September 29, 2017, August 30, 2018, and July 11, 2019, granting the declaratory judgment that Evanston owed a duty to defend in the Dunn, Briggs, and Paszko litigation. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). This appeal then followed.

¶ 24                                    II. ANALYSIS

¶ 25                                   A. Choice of Law

¶ 26        Before addressing the merits, we address whether we must apply the law of Virginia instead of the law of Illinois to resolve this coverage dispute. In the trial court, both parties cited to the law of both states, on the basis that Virginia is the headquarters of MHM, the policies were delivered there, and it was the site of the last act giving rise to a valid contract between the parties. However, both parties agreed that despite doing so, no conflict existed between the law of the two states. Evanston continues to cite the law of both states on appeal, whereas MHM and MPCH argue that there is no reason to apply Virginia law because no conflict exists between the law of the two states. A choice-of-law determination is required only when a difference in law will make a difference in the outcome. *Bridgeview Health Care Center, Ltd. v. State Farm Fire & Casualty Co.*, 2014 IL 116389, ¶ 14. In the absence of a conflict, Illinois law will be applied as the law of the forum. *Chicago Board Options Exchange, Inc. v. International Securities Exchange, L.L.C.*, 2012 IL App (1st) 102228, ¶ 44; *Dearborn Insurance Co. v. International Surplus Lines Insurance Co.*, 308 Ill. App. 3d 368, 373 (1999). A party seeking a choice-of-law determination bears the burden of demonstrating a conflict, *i.e.*, that a difference in the law exists that will make a difference in the outcome of the case. *Bridgeview Health Care Center*, 2014 IL 116389, ¶ 14. Here, because neither party argues that a conflict exists between the law of the two states, let alone

one that is outcome determinative, this court applies Illinois law as the law of the forum.

¶ 27                    B. Law Regarding the Determination of Insurer's Duty to Defend

¶ 28       "It is settled law in Illinois that an insurer has two duties to an insured when a lawsuit is filed that may trigger the insurer's policy coverage: the duty to defend and the duty to indemnify." *Aetna Casualty & Surety Co. v. Prestige Casualty Co.*, 195 Ill. App. 3d 660, 664 (1990) (citing *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23 (1987)). These are separate and distinct duties, and the duty to defend is broader than the duty to indemnify. *Aetna Casualty & Surety Co.*, 195 Ill. App. 3d at 664 (citing *Conway v. Country Casualty Insurance Co.*, 92 Ill. 2d 388, 394 (1982)). A principal difference is that the duty to defend will arise whenever the facts of an underlying complaint fall *potentially* within the policy's coverage, whereas the duty to indemnify will arise only if the facts *actually* fall within the policy's coverage. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 398 (1993). Therefore, in a declaratory judgment action where the issue is whether an insurer has a duty to defend, the court compares the relevant provisions of the insurance policy to the allegations of the complaint in the underlying lawsuit. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010). A duty to defend will be found to exist if the facts alleged in the underlying compliant fall within, or potentially within, the policy's coverage provisions. *Id.* Both the allegations of the underlying complaint and the policy are construed in favor of the insured, and any doubts must be resolved in the insured's favor. *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 153 (1999).

¶ 29       It is also the law that an insurer's duty to defend its insured is not dependent upon a duty to indemnify, but it arises from the expressed undertaking to defend as stated in the insurance contract. *Conway*, 92 Ill. 2d at 394; see also *Zurich Insurance Co.*, 118 Ill. 2d at 48; *Village of Lombard v. Intergovernmental Risk Management Agency*, 288 Ill. App. 3d 1003, 1009 (1997). As

with any contract, the parties to an insurance agreement have the power to contractually define the scope of the insurer's duty to defend. *Village of Lombard*, 288 Ill. App 3d at 1009. Determining the scope of the insurer's duty to defend thus requires review of the language used in the policy. *Zurich Insurance Co.*, 118 Ill. 2d at 48; *American Standard Insurance Co. v. Basbagill*, 333 Ill. App. 3d 11, 16 (2002).

¶ 30　　In interpreting the language of an insurance policy, the court's role is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy. *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311 (2006). To ascertain the intent of the parties and the meaning of the words used in the policy, the court interprets the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured, and the purposes of the entire contract. *Crum & Forster Managers Corp.*, 156 Ill. 2d at 391. If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). However, if the language used in the policy is reasonably susceptible to more than one meaning, it will be considered ambiguous and strictly construed against the drafter. *Id.* A contract term is not ambiguous merely because the parties disagree on its meaning, nor is a term unambiguous where each party insists that the language unambiguously supports its position. *Id.* at 153-54. We apply a *de novo* standard of review to the question of whether an insurer has a duty to defend. *Country Mutual Insurance Co. v. Dahms*, 2016 IL App (1st) 141392, ¶ 35. We may affirm a trial court's ruling that a duty to defend exists on any basis supported by the record, regardless of the basis the trial court relied on. *Pekin Insurance Co. v. AAA-1 Masonry & Tuckpointing, Inc.*, 2017 IL App (1st) 160200, ¶ 21.

¶ 31　　C. Is the duty to defend triggered regardless of whether the complaints seek damages?

¶ 32      In their motion for summary judgment in the trial court, the initial argument of MHM and MPCH was that Evanston's duty to defend was triggered in the three underlying class action lawsuits because the policy required Evanston to defend "any Claim to which coverage under this Coverage Part applies," and the underlying class-action lawsuits satisfied the policy's definition of "Claim" regardless of whether their complaints sought money damages. MHM and MPCH alternatively argued that it was possible for the plaintiffs in the underlying class-action lawsuits to seek money damages because of the complaints' prayers for relief requesting "other and further relief as the Court deems just and proper." The trial court granted summary judgment based upon this alternative argument, by "finding that the underlying complaints' prayer for other relief constitutes a claim for damages under the Evanston policies."[2] However, because we find the argument initially advanced by MHM and MPCH to be dispositive, we choose to begin our analysis there.

¶ 33      The issue before us then is whether Evanston's duty under the policy "to defend and investigate any Claim to which coverage under this Coverage Part applies" is triggered as to the three underlying class action lawsuits on the basis that each complaint constitutes a "Claim" by being either a "demand *** for services involving Professional Healthcare Services" or a "suit *** against the Insured involving Professional Healthcare Services," regardless of whether that complaint also seeks money damages. MHM and MPCH take the position that Evanston's duty to defend is triggered for this reason, and they argue that the policy language does not expressly tie Evanston's defense obligation to suits that seek money damages. They argue that the policy language is at least ambiguous on this point, and therefore the issue must be resolved in their favor.

_____

[2] It is evident to us that the trial court devoted tremendous time and effort to resolving the issue of Evanston's duty to defend in the three cases involved in this appeal and the others not involved in this appeal. However, if the trial court further articulated its reasoning for this ruling on the record beyond this sentence of its written order, the parties have not included the transcript of it in the record on appeal.

By contrast, Evanston's position is that the policy's limitation of the duty to defend to claims "to which coverage under this Coverage Part applies" refers to claims for which Evanston may possibly be obligated to pay money under the "Insuring Agreement" of the coverage part, and because the underlying complaints seek only declaratory and injunctive relief, they are not claims to which coverage under the relevant coverage part "applies."

¶ 34    The relevant coverage part is referred to in the policy as the "*Locum Tenens* and Contract Staffing Professional Liability Insurance Coverage Part" and in some of the endorsements as the "Correctional Healthcare Professions Professional Liability Coverage Part." That coverage part contains multiple sections, titled "Insuring Agreement," "Definitions," "The Exclusions," and "Defense, Settlement and Claim Expenses," among other sections. The "Defense, Settlement and Claim Expenses" section is modified by a "Self-Insured Retention" endorsement. That endorsement provides for a self-insured retention of $100,000, which "shall include Damages and Claim Expenses, whether or not Damages payments are made." There is no dispute in this case that the self-insured retention has been exhausted.

¶ 35    As modified by endorsement, the "Defense, Settlement and Claim Expenses" section of the coverage part provides first for defense of claims within the self-insured retention by a third-party administrator and then for defense by Evanston following exhaustion of the self-insured retention. The pertinent language from that provision states:

> "Defense, Investigation and Settlement of Claims: It shall be the duty of Western Litigation, Inc., hereinafter referred to as "Third Party Administrator", at the first Coverage B. Named Insured's [*i.e.*, MHM or MPCH's] own expense to defend, investigate and settle any Claim against the Insured seeking Damages to which this insurance applies which is within the Self-Insured Retention.

* * *

Upon exhaustion and payment of the Self-Insured Retention, the Company [*i.e.*, Evanston] shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies ***."

The coverage part defines "Claim" as follows:

"Claim means the insured's receipt of:

1. A demand for monetary damages or services involving Professional Healthcare Services; or

2. The service of suit or institution of arbitration proceedings against the Insured involving Professional Healthcare Services."

"Professional Healthcare Services" is then defined to mean "Medical Services," which is further defined in relevant part to mean "services *** provided in the medical care or treatment of any patient" within the provider's license, certificate, or qualification to practice, as well as "Placement Services," which is defined in pertinent part to mean "evaluating, selecting, hiring and contracting with Healthcare Providers to provide Medical Services for healthcare organizations ***."

¶ 36    MHM and MPCH argued in trial court and contend on appeal that the complaints in the Dunn, Briggs, and Paszko cases trigger the duty to defend because each is a "Claim" to which the coverage part applies. The underlying suits meet this definition, they contend, because each complaint is a "demand for *** services involving Professional Healthcare Services," as that term is defined in the policy. They argue that each complaint demands services by seeking an injunction from the district court that would compel the underlying defendants to provide certain medical or mental health care services to the respective plaintiff classes. For the same reasons, they contend that each of the underlying complaints is also a "suit *** against the Insured involving Professional

Healthcare Services." (They note that "Insured" also means to an "Additional Insured," as discussed in more detail below.) They argue that there is no requirement in the plain language of the policy that a "Claim" must seek damages in order to trigger the duty to defend, and interpreting it to require this would render meaningless the phrases "or services" and "suit *** involving Professional Healthcare Services," which are part of the policy's definition of "Claim." At the very least, they argue, the policy's requirement that Evanston defend "any Claim to which coverage under this Coverage Part applies" is ambiguous and therefore must be construed in their favor.

¶ 37     Evanston's position is that the argument by MHM and MPCH overemphasizes the word "Claim" in the defense provision and ignores the phrase "to which coverage under this Coverage Part applies." It contends that, regardless of whether each complaint in the Dunn, Briggs, and Paszko cases asserts a "Claim" under the policies, Evanston's duty to defend arises only if a Claim is one "to which coverage under this Coverage Part applies." Evanston argues that the critical word in that provision is "applies," which the dictionary defines as "[t]o put into action." See American Heritage Dictionary 121 (2d college ed. 1982). Evanston argues that coverage under the policies is "put into action" only with respect to claims for which it must potentially pay money under the "Insuring Agreement" of the coverage part. The "Insuring Agreement" provides in pertinent part that Evanston "shall pay on behalf of the Insured all sums in excess of the Self-Insured Retention amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims ***."[3] Evanston argues that, because the complaints in the underlying cases seek only declaratory and injunctive relief and not money damages, there is no possibility that Evanston will pay money under the "Insuring Agreement," meaning the policy is

_____

[3] Although "Damages" is a defined term in the policy, its definition only becomes relevant if we must resolve whether a claim for injunctive relief constitutes a claim seeking "Damages."

not "put into action" such that it "applies" to the underlying class-action complaints or triggers the duty to defend. It argues that, by recognizing that the policy provides a defense conditioned on coverage applying under the Insuring Agreement, this court would be giving effect to the plain language of the defense provision.

¶ 38    Evanston contends that Illinois courts recognize that a determination of whether an insurance policy "applies" begins with the terms of a policy's insuring agreement. It cites *Madison County Mutual Automobile Insurance Co. v. Goodpasture*, 49 Ill. 2d 555, 556 (1971), in which the court looked to the insuring agreement where the "sole issue presented [was] whether the insured motor vehicle coverage applies." However, the issue in that case was "whether the uninsured motor vehicle provision of [an] automobile insurance policy is applicable to claims against the uninsured driver of a named insured's automobile when the named insured is injured while riding as a passenger." *Id.* The court looked to the insuring agreement of the uninsured motor vehicle coverage part because the insuring agreement's terms resolved the question before the court. The court was not addressing the relationship between a policy's insuring agreement and its provision concerning the insurer's duty to defend an insured. We thus conclude that *Madison County Mutual* does not provide support for the argument advanced by Evanston.

¶ 39    Evanston also contends that Illinois courts have declined to consider policy provisions beyond an insuring agreement where it is found that the insuring agreement does not provide coverage. It cites *Stoneridge Development Co. v. Essex Insurance Co.*, 382 Ill. App. 3d 731, 756 (2008), in which the court stated that "where the damage does not fall within the policy's coverage, there is no need to consider the applicability of any exclusions." While that case did involve a duty to defend, the duty to defend provision was included within insuring agreement and the outcome of the case was thus controlled by the language of the insuring agreement. The "Insuring

Agreement" stated: " 'We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages.' " *Id.* at 733. The insuring agreement further provided that the insurance applied to "property damage" only if it was caused by an "occurrence." *Id.* The issue in the case was whether cracks that developed in the foundation of a townhome built by the insureds were caused by an "occurrence" and therefore constituted "property damage" so as to trigger coverage. *Id.* at 749. Because of these distinctions, we find that *Stoneridge Development* provides no support for Evanston's argument that a "Claim" must be one for which it could potentially pay money under the Insuring Agreement to constitute a "Claim to which coverage under this Coverage Part applies."

¶ 40    To the extent Evanson is arguing that in all cases a duty to indemnify or pay money under a policy's insuring agreement must exist in order for a duty to defend to arise, we reject that argument.  Rather, as we stated above, the law is that "the insurer's duty to defend its insured is not dependent upon a duty to indemnify, but arises from the undertaking to defend stated in the policy." *Conway*, 92 Ill. 2d at 394; see also *Zurich Insurance Co.*, 118 Ill. 2d at 48; *Village of Lombard*, 288 Ill. App. 3d at 1009. The parties have the power to contractually define the scope of the insurer's undertaking to defend its insured. *Village of Lombard*, 288 Ill. App. 3d at 1009. In this case, the defense provision is not included within the policy's insuring agreement, and nothing in the defense provision expressly incorporates or refers to the insuring agreement.

¶ 41    Having fully considered the relevant policy language, this court agrees with the position advanced by MHM and MPCH that the Dunn, Briggs, and Paszko complaints each constitute a "Claim to which coverage under this Coverage Part applies" that Evanston has a duty to defend, regardless of whether those complaints seek money damages. By seeking an injunction that would

compel the underlying defendants to take actions to provide certain constitutionally adequate medical or mental health services to prisoners, increase staffing at prisons to provide greater medical services, or change prison policies in order to provide additional or different medical or mental health care, medications, and services, we find that each complaint constitutes a "demand for *** services involving Professional Healthcare Services" as well as a "suit *** involving Professional Healthcare Services." Those clauses in the policy's definition of "Claim" must be given effect, and we would improperly nullify them or render them meaningless if we interpreted "Claim to which coverage under this Coverage Part applies" to mean only one that is a "demand for monetary damages." See *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011) ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used.").

¶ 42     In ascertaining that this was the intent of the parties, we take into account the type of insurance for which the parties contracted, the risks undertaken and purchased, the subject matter insured, and the purposes of the contract. *Crum & Forster Managers Corp.*, 156 Ill. 2d at 391. Here, we are dealing with a policy of professional liability insurance specifically for individuals and organizations providing healthcare services within correctional institutions. This policy specifically provides coverage for "Professional Personal Injury," and it defines that term to include "an allegation of a civil rights violation pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.*) and amendments thereto, provided that such allegation is the result of any patient receiving Medical Services." The underlying cases illustrate that such healthcare providers and organizations are uniquely susceptible to being named as defendants in civil rights lawsuits by inmates alleging that their eighth amendment rights are being violated by the medical care that is or is not being provided to them. While most such suits are likely to involve a claim for money

damages, it is easily foreseeable that some will seek only non-monetary relief. Examples come to mind in which qualified immunity would clearly bar a claim for money damages but not for prospective injunctive relief (see *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998)), in which an incarcerated plaintiff may elect to forego the former in the hope of more quickly obtaining the latter. Considering the nature and purpose of this insurance policy, we believe it was reasonably contemplated by the parties that the covered healthcare providers could be named as defendants in civil rights suits by prisoners that demanded healthcare services or otherwise involved professional healthcare services without necessarily seeking money damages and that Evanston would defend them in such suits.

¶ 43        Furthermore, although Evanston contends that the critical word of the defense provision is "applied," we believe that the critical word is "coverage." Evanston's argument does not address the meaning of "coverage," but its argument assumes that it means to pay money or indemnify. The policy does not define the word "coverage." The current edition of Black's Law Dictionary defines "coverage" as "[i]nclusion of a risk under an insurance policy; the risks within the scope of an insurance policy." Black's Law Dictionary 461 (11th ed. 2019). It also gives several definitions of "risk," one of which is "[t]he type of loss covered by a policy; a hazard from a specified source <this homeowner's policy covers fire risks and flood risks>." *Id.* at 1589. We note also that an earlier edition of Black's Law Dictionary defined "coverage" as "[i]n insurance, amount and extent of risk contractually covered by insurer. The assumption of risk of occurrence of the event insured against before its occurrence." Black's Law Dictionary 365 (6th ed. 1990). An Illinois court has likewise defined "coverage" according to that definition as "the amount and extent of risk contractually assumed by an insurer." *Illinois Farmers Insurance Co. v. Tabor*, 267 Ill. App. 3d 245, 252 (1994) (quoting Black's Law Dictionary 365 (6th ed. 1990)). While we

recognize that the word "coverage" is frequently used colloquially to refer to an obligation to indemnify or pay money under an insurance policy, the term actually has a broader meaning than this. Given the definition of "Claim" in the policy, it appears to us that, when the defense provision at issue refers to a "Claim to which coverage under this Coverage Part applies," it is using the word "coverage" in its broader sense to refer to the risk of a certain kind of event or loss occurring that is within the scope of the coverage part, not necessarily that Evanston will indemnify or pay money because of the occurrence of that event or loss.

¶ 44    The structure of the coverage part in its entirety further supports our interpretation of what the parties reasonably intended by a "Claim to which coverage under this Coverage Part applies." The section of the coverage part titled "The Exclusions" uses similar terminology in setting forth various categories of "Claims" that "[t]his insurance does not apply to." To give two examples pertinent to this case, that section states:

> "This insurance does not apply to: ***
>
>> F.    any Claim based upon or arising out of any unlawful discrimination by an insured; provided, however, this exclusion shall not apply to any civil rights violation alleged pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.*) and amendments thereto, provided that such civil rights violation arises out of Medical Services for which the insured is legally liable.
>>
>> * * *
>>
>> I.    Any Claim based upon or arising out of the liability of others assumed by the Insured under any contract or agreement, unless such liability would have attached to the Insured even in the absence of such contract or agreement[.]"

We find that the coverage part's use of this similar terminology in setting forth categories of

"Claims" that "[t]his insurance does not apply to" supports our conclusion that the parties intended the word "coverage" in the defense provision to refer to the risk of certain categories of events or losses occurring within the scope of the coverage part, not necessarily the payment of money.

¶ 45    Finally, we find support for our interpretation in the fact that the policy's defense provision imposes on Western Litigation, Inc., a duty to defend "any Claim against the Insured *seeking Damages* to which this insurance applies," while imposing on Evanston a duty to defend "any Claim to which *coverage* under this Coverage Part applies." (Emphasis added.) When parties to a contract use different language to address parallel issues, it is reasonable to infer that they intended this language to mean different things. *Lobo IV, LLC v. V Land Chicago Canal, LLC*, 2019 IL App (1st) 170955, ¶ 81. Thus, the parties' inclusion of the phrase "seeking damages" in the former provision and omission of it from the latter leads us to the conclusion that the parties did not reasonably intend that a "Claim to which coverage under this Coverage Part applies" necessarily had to be one "seeking Damages" in order to trigger Evanston's duty to defend.

¶ 46    Because we have concluded that the Dunn, Briggs, and Paszko complaints trigger Evanston's "duty to defend and investigate any Claim to which coverage under this Coverage Part applies" regardless of whether they explicitly seek money damages, we have no reason to consider the parties' alternative arguments concerning whether the underlying complaints' general prayers for "other and further relief as the Court deems just and proper" constitute a request for money damages.

¶ 47         D. The Contractual Liability Exclusion and Additional Insured Endorsement

¶ 48    Evanston next argues that it has no duty to defend because the contractual liability exclusion of the professional liability coverage part precludes coverage for the three underlying lawsuits. That contractual liability exclusion states:

"This insurance does not apply to:

\*\*\*

I.    Any Claim based upon or arising out of the liability of others assumed by the Insured under any contract or agreement, unless such liability would have attached to the Insured even in the absence of such contract or agreement."

Evanston argues that this exclusion precludes any duty to defend because MHM and MPCH are seeking coverage for the potential liability of the Alabama DOC and the Massachusetts DOC in the underlying class action lawsuits, pursuant to the indemnification agreements in the contracts between them.

¶ 49    The contracts to which Evanston is referring are the service agreements between MHM and the Alabama DOC and between MPCH and the Massachusetts DOC. In the former, MHM was required to name the Alabama DOC as an additional insured in its medical malpractice liability insurance. MHM additionally agreed that it would "indemnify and hold harmless" the Alabama DOC and its officers and employees "from and against any and all loss or damages \*\*\* for liability claimed against or imposed upon the [Alabama DOC] because of bodily injury \*\*\* arising out of or as a consequence of" the breach of any contractual duty or negligence by MHM or its agents in the performance of the contract. That indemnity and hold-harmless provision did "not extend to any liability caused by the negligence of the [Alabama DOC] or its employees." Likewise, the service agreement between MPCH and the Massachusetts DOC provided that MPCH was to name the Massachusetts DOC as an additional insured in its professional liability insurance. It also provided that neither party "shall act as an employee or agent of the other" in the performance of their obligations under the contract. A 2014 amendment to the service agreement added a provision whereby MPCH agreed to indemnify and hold harmless the Massachusetts DOC and its agents,

officers, and employees from "any and all claims, liabilities and costs for any personal injury \*\*\* or other damages that the State may sustain which arise out of or in connection with [MPCH's] performance of a Contract."

¶ 50    Evanston argues that the contractual liability exclusion precludes coverage for all three underlying lawsuits. It points out that MHM is not named as a defendant in the Dunn litigation, arguing that the complaint alleges no wrongdoing on the part of MHM but seeks relief only based on the Alabama DOC's longstanding failure to provide prisoners with services, treatment, and care. Evanston argues that coverage is barred in the Briggs and Paszko cases because the liability of MPCH arises solely from the obligations and liabilities that MPCH voluntarily assumed by entering into the service agreement with the Massachusetts DOC. Evanston contends that MHM and MPCH contractually assumed the legal obligations of the state departments of correction to provide prisoners with medical and health care, and MHM and MPCH would have no legal liability to the underlying prisoner-plaintiffs in the absence of such contracts.

¶ 51    We find that the applicability of the contractual liability exclusion cannot be considered without reference to the policy's additional insured endorsement, which also addresses coverage pertaining to the contractual obligations of MHM and MPCH and, if applicable, affects who is considered an "Insured" for purposes of the contractual liability endorsement. The additional insured endorsement for professional liability coverage amends the policy by providing that, whenever the term is used in the relevant coverage part, "the unqualified word Insured shall also mean Additional Insured." That endorsement then goes on to provide:

"Additional Insured means, whenever used in this endorsement:

Any person or organization to whom or to which the Named Insured [*i.e.*, MHM or MPCH] is obligated by virtue of a valid written contract to provide insurance or indemnity such as

is afforded by the policy, but only for claims made against the Additional Insured with respect to professional services rendered by the Named Insured as specified in Item 1. 1. B of the Declarations [*i.e.*, MHM or MPCH]."

We also find relevant an endorsement to the policy titled "Restriction of Coverage—Scheduled Contracts," which provides that "it is hereby understood and agreed that the insurance provided under this policy shall apply solely to correctional healthcare contracts on file with The Company [*i.e.*, Evanston] at the time a claim or suit is made to the Insured." MHM and MPCH additionally direct our attention to an unrebutted affidavit providing evidence that the "correctional healthcare contracts" referred to in that endorsement include the service agreements at issue between MHM and the Alabama DOC and between MPCH and the Massachusetts DOC.

¶ 52     Evanston's position on this matter is that the state departments of correction do not qualify as additional insureds for purposes of imposing a duty to defend, because the claims in the underlying class action lawsuits are not ones made against the state departments of correction "with respect to professional services rendered by the Named Insured." Evanston contends that, rather than arising from professional services rendered by MHM or MPCH, each of the underlying class action lawsuits arises out of the respective state department of correction's longstanding and systemic failure to provide prisoners with adequate and necessary care and to ensure their safety and wellbeing, failures which exceed the professional services that MHM or MPCH contractually agreed to provide. Evanston contends that these alleged failures include the intentional and systemic underfunding of medical and mental health care, the ongoing failure to provide prisoners with effective treatments, the use of excessive force and violence, and many other wrongs unrelated to the competency of any medical or mental health services rendered by MHM or MPCH.

¶ 53     We reject Evanston's argument and conclude that the state departments of correction qualify

as additional insureds under the endorsement for purposes of the duty to defend. First, we find that the Alabama DOC and the Massachusetts DOC are both "organization[s] *** to which the Named Insured [*i.e.*, MHM or MPCH] is obligated by virtue of a valid written contract to provide insurance or indemnity such as is afforded by the policy." MHM and MPCH are obligated by their respective service agreements to name as additional insured and to indemnify and hold harmless the respective state department of correction with respect to the professional liability coverage as afforded by the policy, and the evidence demonstrates that these service agreements were on file with Evanston at the relevant time it issued the policy.

¶ 54 Second, we find that each of the three underlying lawsuits at least potentially asserts a claim against the respective state department of correction "with respect to professional services rendered by the Named Insured." In evaluating this question, we note that this is a broad clause. Also, we reiterate that we are evaluating a duty to defend, which arises if the alleged facts in the underlying complaints fall at least *potentially* within the relevant coverage provisions. *Wilson*, 237 Ill. 2d at 455. Further, when an insurer has a duty to defend against one claim in a suit, it has a duty to defend against all claims, even if some of the claims standing alone would be beyond the scope of the policy. *Illinois Tool Works Inc. v. Travelers Casualty & Surety Co.*, 2015 IL App (1st) 132350, ¶ 44. Thus, although we do not disagree with Evanston that some of the allegations of the underlying suits "implicate systemic failures by the [state departments of correction], rather than the specific health care services MHM agreed to provide," such allegations do not negate the duty to defend if other allegations in the complaint potentially give rise to such duty.

¶ 55 In the Dunn litigation, the underlying complaint is replete with allegations against the Alabama DOC to effect that "[p]risoners with mental illnesses or serious psychological problems are entirely denied mental health care or provided only with medication with little or no medication

management, follow-up, or concern for side effects, some of which are debilitating. Mental health care other than medications is nearly non-existent." This is clearly a claim "with respect to professional services rendered by" MHM, because the professional services that MHM renders to the Alabama DOC under the service agreement "encompass all duties required in the management of a system to deliver comprehensive mental health care to inmates." Further, although MHM is not named as a defendant in the Dunn litigation, the underlying complaint does allege the following:

"234.      When [the Alabama DOC] issued its request for proposals for a mental health services contract in 2013, it identified the minimum staffing needs from the provider to be 144.95 full-time equivalent employees. Under the current contract, MHM Correctional Services ('MHM') is not providing even this inadequate number of mental health staff. The staffing provided under the new MHM contract is just 126.5 full-time equivalent employees."

We agree with MHM that this factual allegation constitutes a specific claim against the Alabama DOC "with respect to professional services rendered by" MHM. Therefore, the Alabama DOC qualifies as an additional insured under the endorsement with respect to the Dunn litigation.

¶ 56      In the Briggs litigation, the complaint alleges a claim that the Massachusetts DOC has violated the eighth amendment rights of prisoners who are deaf or heard of hearing, by being deliberately indifferent to their medical needs through the failure to provide interpretive services and assistive devices during medical and mental health treatment. The complaint alleges that such prisoners have been "[e]xcluded from full participation in medical, mental health, and counseling services and programs offered by the [Massachusetts DOC] and medical contractor [MPCH]." It alleges that "[the Massachusetts DOC] and MPCH have refused to provide medically required hearing aids to deaf and hard of hearing prisoners" and failed "to fix broken hearing devices

promptly." It alleges that MPCH is responsible for arranging interpretation services for deaf and heard of hearing prisoners to communicate accurately and effectively with medical staff but that such services are rarely if ever provided to prisoners who need them. These allegations constitute a claim against the Massachusetts DOC "with respect to professional services rendered by" MPCH, and therefore the Massachusetts DOC qualifies as an additional insured under the endorsement with respect to the Briggs litigation.

¶ 57        Finally, in the Paszko litigation, the complaint alleges that the commissioner of the Massachusetts DOC has, along with MPCH, been deliberately indifferent to the medical needs of prisoners with Hepatitis C by failing and refusing to provide to them a better medication regimen that became available in 2014, thereby violating their eighth amendment rights. It contends that the "[Massachusetts DOC] and MPCH have instead continued a years-long reduction in the number of patients treated for Hepatitis C; they have knowingly delayed evaluating prisoners, and they have consciously avoided knowledge of their treatment needs." Again, such allegations constitute a claim against the Massachusetts DOC "with respect to professional services rendered by" MPCH, and therefore the Massachusetts DOC qualifies as an additional insured under the endorsement with respect to the Paszko litigation.

¶ 58        Having found that the respective state departments of correction qualify as additional insureds for purposes of the underlying lawsuits in which they are defendants, we return to Evanston's argument that the contractual liability exclusion nevertheless precludes it from having a duty to defend. As stated above, that exclusion provides that the insurance does not apply to "[a]ny Claim based upon or arising out of the liability of others assumed by the Insured under any contract or agreement, unless such liability would have attached to the Insured even in the absence of such contract or agreement." We reject Evanston's argument, as we cannot interpret this

exclusion to bar the very coverage contemplated under the additional insured endorsement. In other words, by the additional insured endorsement Evanston agreed, with respect to certain claims, to extend coverage to "[a]ny person or organization to whom or to which the Named Insured is obligated by virtue of a valid written contract to provide insurance or indemnity such as is afforded by the policy." The relevant service agreements by virtue of which MHM and MPCH undertook to provide insurance or indemnity to the state departments of correction were on file with Evanston at the relevant time it issued the policy. If Evanston was nevertheless allowed to rely upon the same service agreements to exclude this coverage by characterizing them as MHM or MPCH's having contractually assumed the liability of others, the coverage afforded by the additional insured endorsement would be rendered illusory. We decline interpret the policy in a way that would render coverage illusory. *Illinois Farmers Insurance Co. v. Keyser*, 2011 IL App (3d) 090484, ¶ 15. We must also give effect to provisions of an endorsement over any conflicting policy provisions. *Zurich Insurance Co. v. Walsh Construction Co.*, 352 Ill. App. 3d 504, 509 (2004). Therefore, we hold that the contractual liability exclusion does not bar Evanston's duty to defend in this circumstance.

¶ 59                                III. CONCLUSION

¶ 60        For the foregoing reasons, the trial court's declaratory judgment that Evanston owed a duty to defend in the underlying Dunn, Briggs, and Paszko lawsuits is affirmed.

¶ 61        Affirmed.