2022 IL App (2d) 210175
No. 2-21-0175
Opinion filed March 4, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| ILLINOIS UNION INSURANCE COMPANY, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff and Counterdefendant-Appellee, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 19-MR-1026 |
| | ) | |
| MEDLINE INDUSTRIES, INC.; KATHLEEN | ) | |
| KOCH; CHANDRA SEFTON; PATTY | ) | |
| BENNETT; DAWN REX, on Behalf of Her | ) | |
| Minor Son, Samuel Dolcimascolo; and | ) | |
| DENNIS BREBNER, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Medline Industries, Inc., Defendant and | ) | Luis A. Berrones, |
| Counterplaintiff-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant and counterplaintiff, Medline Industries, Inc. (Medline), appeals an order of the circuit court of Lake County granting judgment on the pleadings in favor of plaintiff and counterdefendant, Illinois Union Insurance Company (Illinois Union). Medline also appeals the dismissal with prejudice of its second amended counterclaim. We affirm.

¶ 2                  I. BACKGROUND

¶ 3                  A. Introduction

¶ 4     This is an insurance-coverage dispute. In 2019, defendants Kathleen Koch; Chandra Sefton; Patty Bennett; Dawn Rex, on behalf of her minor son, Samuel Dolcimascolo; and Dennis Brebner (collectively the underlying plaintiffs) sued Medline in Cook County for injuries allegedly caused by emissions of ethylene oxide gas (EtO) from Medline's medical instruments sterilization facility in Waukegan (the Waukegan facility). Medline tendered those lawsuits to its insurer, Illinois Union, for defense. Illinois Union declined to defend or indemnify Medline.

¶ 5     On November 1, 2019, Illinois Union filed in the circuit court of Lake County a complaint for declaratory judgment, which it later amended. Illinois Union contended that it did not owe a duty to either defend or indemnify Medline in the underlying lawsuits. Illinois Union joined the underlying plaintiffs as defendants in the declaratory judgment action solely because they had an interest in whether Medline's insurance coverage was available to them. Illinois Union sought no relief against the underlying plaintiffs. The underlying plaintiffs are not parties to this appeal.

¶ 6                  B. The Insurance Policy

¶ 7     At the Waukegan facility, Medline sterilizes medical instruments. In this process, Medline emits EtO, which is a carcinogenic and mutagenic gas. Medline purchased a claims-made premises pollution liability insurance policy (the policy) from Illinois Union. The "retroactive date" of the policy was September 29, 2008, which is also when Medline acquired the Waukegan facility. The "retroactive date" in such a policy specifies the date of the earliest occurrence to be covered, regardless of when the claim is made. *Medical Protective Co. v. Kim*, 507 F.3d 1076, 1082-83 (7th Cir. 2007). This is in contrast to "full retroactive" coverage, which places no limitations on

coverage for past occurrences and would cover occurrences predating Medline's acquisition of the facility. See *Kim*, 507 F.3d at 1082.

¶ 8     In section IA of the policy, Illinois Union agreed to pay claims arising out of a "pollution condition" on, at, under, or migrating from a "covered location." It is undisputed that the Waukegan facility is a covered location.

¶ 9     The policy defined "pollution condition" as

>  "[t]he discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, 'low-level radioactive waste,' 'mixed waste,' and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater."

Section IA further provided that coverage applied only to "pollution conditions" that "first commence, in their entirety, on or after the retroactive date *** and prior to the expiration of the 'policy period.' " Section IIIA of the policy provided that Illinois Union had the duty to defend Medline against a claim to which "this insurance applies."

¶ 10                    C. The Coverage Dispute

¶ 11     Illinois Union denied coverage on the basis that the underlying complaints alleged that the Waukegan facility (whether owned by Medline or its predecessors) released EtO since 1994. Thus, Illinois Union interprets the underlying complaints as alleging that the emissions first commenced prior to the retroactive date of the policy. Medline, however, interprets the underlying complaints to allege many discrete emissions that occurred both before and after the retroactive date. Medline interprets "pollution condition," as defined in the policy, to mean that each discrete emission is a

new "pollution condition." Therefore, Medline reasons, pollution conditions occurring on or after the retroactive date would be covered because they did not commence in their entirety prior thereto.

¶ 12 Medline filed a second amended answer, affirmative defenses, and a second amended counterclaim to Illinois Union's amended complaint for declaratory judgment. Attached to and incorporated into this second amended counterclaim were copies of complaints filed in 19 lawsuits, alleging that numerous plaintiffs sustained injuries as a result of Medline's EtO emissions. These 19 lawsuits included those filed by the underlying plaintiffs. Medline sought a declaration that Illinois Union owed Medline a defense and indemnification for all of these underlying lawsuits.

¶ 13                              D. The Underlying Lawsuits

¶ 14 Eighteen of the lawsuits were filed against Medline in 2019 in the circuit court of Cook County. The nineteenth suit, a class action, was filed in 2020 in federal district court. Each of the complaints made similar allegations.

¶ 15 Pertinent to this appeal, the underlying complaints' common allegations included the following. "Medline and its predecessors have used, and Medline continues to use, EtO in industrial medical device sterilization since approximately 1994 ***." "Medline's predecessors consistently released over 4000 pounds of EtO between 1996 and 2001, including approximately 17,000 pounds between 1999 and 2001." "While some EtO emissions are from controlled sources, the majority of these emission estimates are 'fugitive emissions' that have been escaping, and continue to escape, the facility." "[I]ndividuals [living within a radius of Medline's Waukegan facility] have been inhaling EtO on a routine and continuous basis for decades." "While *** Medline [has] been knowingly and continuously releasing EtO for decades, people living and working in the surrounding community were unaware that [Medline] routinely and continuously exposed them to a dangerous, toxic, carcinogenic, and mutagenic gas." "Now [persons living near

the Waukegan facility] are suffering from a variety of cancers, miscarriages, birth defects, and other life-altering health effects from continuous exposure to [EtO]." "Local residents and workers in the area have unknowingly been exposed to carcinogenic ethylene oxide for decades ***." "[A]ccording to self-reported emissions data submitted to the Illinois [Environmental Protection Agency], Medline continued to release large amounts of EtO into the surrounding community for years ***."

¶ 16    The underlying complaints described Medline's sterilization process as follows.

"The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate."

¶ 17    The above-quoted allegations were contained in introductory, or prefatory, paragraphs of the underlying complaints, preceding counts alleging negligence, willful and wanton conduct, public nuisance, and strict liability. The specific acts or omissions allegedly committed by Medline were: (1) emitting dangerous volumes of EtO into the air from the Waukegan facility, (2) disregarding safe methods to adequately control EtO emissions, (3) failing to warn or advise those who live or work in the community that they were being exposed to EtO, (4) failing to adequately record test results of high levels of EtO, (5) ignoring test results of high levels of EtO, (6) underreporting EtO levels, and (7) subjecting those who live or work near the Waukegan facility to increased cancer risks. The underlying complaints did not allege specific dates or times when the EtO emissions occurred.

¶ 18             E. Illinois Union's Motion for Judgment on the Pleadings

¶ 19 On February 20, 2020, Illinois Union filed a motion for judgment on the pleadings. For coverage to exist, Illinois Union argued, the alleged emissions of EtO " 'must first commence, in their entirety, on or after the retroactive date' " of September 29, 2008. Illinois Union contended that, because the underlying complaints alleged that the Waukegan facility had released EtO since 1994, there was no potential for coverage.

¶ 20 On July 8, 2020, the court denied the motion on the ground that there was a genuine issue of fact as to whether the pollution condition existed before the retroactive date. Illinois Union then filed a motion to reconsider, arguing that whether a duty to defend the underlying lawsuits was triggered must be determined solely by comparing the allegations of the underlying complaints with the policy language. On September 30, 2020, the court granted the motion to reconsider, vacated the July 8 order, and granted Illinois Union's motion for judgment on the pleadings. The court found that Illinois Union had no duty to defend and, therefore, no duty to indemnify Medline regarding the underlying lawsuits.[1]

¶ 21 F. Medline's Motion to Reconsider the Grant of Judgment on the Pleadings

¶ 22 On October 30, 2020, Medline filed a motion to reconsider the grant of judgment in Illinois Union's favor. Medline noted that it had moved in Cook County to strike the underlying complaints' references to the "continuous" release of EtO. Medline argued that its motion to strike portions of the underlying complaints constituted a change of facts. Medline included, as an exhibit to its motion to reconsider, a copy of its motion to strike filed in Cook County.

---

[1] The underlying lawsuits referenced in the September 30, 2020, order were those filed by the underlying plaintiffs.

¶ 23    Medline argued in Cook County that allegations of continuity in the underlying complaints were "immaterial to the claims being asserted" and were "cited prejudicially by [Illinois Union] *** to defeat coverage *** based on an incorrect interpretation of [the words 'constant' or 'continuous' or 'took place continuously']." The underlying plaintiffs agreed to Medline's motion to strike. On March 5, 2021, Medline supplemented its motion to reconsider with a copy of a February 25, 2021, order entered by the circuit court of Cook County striking language "describing the release of ethylene oxide at the Waukegan sterilization facility as constant, continuous, or taking place continuously." On March 10, 2021, the Lake County court denied Medline's motion to reconsider the grant of judgment on the pleadings. The court found that striking allegations of continuity from the underlying complaints did not alter the allegation that emissions of EtO from the Waukegan facility preceded the retroactive date of the policy.

¶ 24     G. Illinois Union's Motion to Dismiss Medline's Second Amended Counterclaim

¶ 25    On October 23, 2020, while Medline's motion to reconsider was pending, Illinois Union moved to dismiss Medline's second amended counterclaim on the ground that the court had already determined that the policy afforded no coverage. On March 10, 2021, the court dismissed Medline's second amended counterclaim with prejudice, finding that Illinois Union had no duty to defend or indemnify Medline in any of the 19 underlying lawsuits. Medline filed a timely notice of appeal.

¶ 26                                    II. ANALYSIS

¶ 27                                 A. Standard of Review

¶ 28    A court may properly enter judgment on the pleadings only where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 349 Ill. App. 3d 779, 781-82 (2004). A motion for judgment

on the pleadings tests the sufficiency of the pleadings by determining whether the plaintiff is entitled to the relief sought by his or her complaint. *Pekin Insurance Co. v. Allstate Insurance Co.*, 329 Ill. App. 3d 46, 49 (2002). The trial court is required to examine the pleadings to determine whether there is an issue of fact or whether the controversy can be resolved as a matter of law. *Pekin*, 329 Ill. App. 3d at 49. Our standard of review is *de novo*. *Gillen*, 349 Ill. App. 3d at 782.

¶ 29                    B. Construction of Insurance Policies

¶ 30    The court's primary objective in construing an insurance policy is to ascertain and give effect to the parties' intent. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292 (2001). The court must construe the policy as a whole, considering the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Travelers*, 197 Ill. 2d at 292. If the policy language is clear and unambiguous, the court must give the words their plain, ordinary, and popular meanings. *Travelers*, 197 Ill. 2d at 292-93. Conversely, if the words are susceptible to more than one meaning, they are ambiguous and will be strictly construed against the insurer and in favor of the insured. *Travelers*, 197 Ill. 2d at 293. The construction of an insurance policy is a question of law, which we review *de novo*. *Travelers*, 197 Ill. 2d at 292.

¶ 31    In a declaratory judgment action, where the issue is whether the insurer has a duty to defend, courts ordinarily first look to the allegations in the underlying complaint and compare those allegations with the relevant provisions of the insurance policy. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010). If the facts in the underlying complaint fall within, or *potentially* within, the policy's coverage, the insurer's duty to defend is triggered. *Wilson*, 237 Ill. App. 3d at 455. An insurer can refuse to defend only if the allegations of the underlying complaint preclude any possibility of coverage. *Illinois Tool Works Inc. v. Travelers Casualty & Surety Co.*, 2015 IL App (1st) 132350, ¶ 27. Where a factual uncertainty exists, such as whether the injury

occurred at a time that is covered by the policy, an insurer cannot avoid its duty to defend. *Illinois Tool Works*, 2015 IL App (1st) 132350, ¶ 28. An insurer's duty to defend is broader than its duty to indemnify. *Wilson*, 237 Ill. App. 3d at 456.

¶ 32    C. Whether the Court Properly Granted Illinois Union Judgment on the Pleadings

¶ 33    Medline contends that the policy's retroactive date does not avoid Illinois Union's duty to defend, because (1) the underlying complaints alleged intermittent releases of EtO and (2) each intermittent release of EtO was a separate "pollution condition." Illinois Union counters that the allegations of the underlying complaints do not fall within the policy's language and that pollution occurring over many years from a single source is treated as a single pollution event.

¶ 34        1. *Comparison of the Underlying Complaints to the Policy Language*

¶ 35    Medline first argues that the underlying complaints allege (intermittent emissions of EtO. Medline relies on the following language from the underlying complaints:

> "The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate."

Using this language, Medline argues that it is alleged to pump EtO into the atmosphere in batches rather than in one continuous release. To support its argument that the underlying plaintiffs are alleging multiple discrete emissions, Medline urges us to consider its own pleadings in the declaratory judgment action. Medline also cites a response to Illinois Union's motion for judgment on the pleadings, filed by four of the underlying plaintiffs. In that response, the four underlying plaintiffs clarified that the Waukegan facility did not emit EtO continuously "in a constant stream,"

but in "discrete instances." Medline further cites the Cook County order striking references to continuity in the underlying complaints.

¶ 36    The parties disagree on whether we may look beyond the eight corners of the underlying complaints and the insurance policy. As noted, courts generally first look to the allegations in the underlying complaint and compare those allegations with the relevant provisions of the insurance policy. *Wilson*, 237 Ill. 2d at 455. However, Medline asserts that we are not limited to the underlying complaints but may look to other filings in both the underlying lawsuits and this declaratory judgment action. Medline relies on *Wilson*. *Wilson*, like the instant case, involved a motion for judgment on the pleadings. See *Wilson*, 237 Ill. 2d at 462. In *Wilson*, the court determined that a genuine issue of material fact existed, precluding judgment on the pleadings, by comparing the counterclaim in the underlying case to the allegations of the underlying complaint. *Wilson*, 237 Ill. 2d at 463-64. Thus, Illinois Union argues that the court in *Wilson* considered only the pleadings on file in the underlying case in deciding whether a duty to defend existed. However, the court in *Wilson* bolstered its holding by looking at the defendant's memorandum and attachments in opposition to the motion for judgment on the pleadings in the declaratory judgment action. *Wilson*, 237 Ill. 2d at 464. Illinois Union also cites *Konstant Products, Inc. v. Liberty Mutual Fire Insurance Co.*, 401 Ill. App. 3d 83, 88 (2010), for the proposition that the eight corners rule applies unless the insurer is aware of a true but unpleaded fact. In *Konstant Products*, the court held that the exception to the eight corners rule did not apply where the underlying complaint's allegations, if true, would bar coverage. *Konstant Products*, 401 Ill. App. 3d at 87-88.

¶ 37    Here, the underlying complaints allege that the Waukegan facility emitted EtO since 1994. Specifically, the underlying complaints allege that "Medline and its predecessors have used, and Medline continues to use, EtO in industrial medical device sterilization since approximately 1994

\*\*\*." Additionally, the underlying complaints allege that "Medline's predecessors consistently released over 4000 pounds of EtO between 1996 and 2001, including approximately 17,000 pounds between 1999 and 2001." Thus, the underlying complaints allege that the earliest emissions occurred prior to the policy's retroactive date of September 29, 2008.

¶ 38 Medline maintains that (1) the allegations of continuous emissions in the underlying complaints leave open the possibility that the emissions occurred in batches, (2) the continuity allegations are conclusory and should be disregarded, (3) the underlying plaintiffs affirmed in pleadings that they did not plead that the emissions were uninterrupted but that the emissions were released after each sterilization cycle, and (4) the term "continuous" is ambiguous.

¶ 39 We need not depart from the eight corners rule, because we read the continuity allegations in the underlying complaints to concern the span of time during which the Waukegan facility released EtO rather than alleging one unbroken stream since 1994.

¶ 40 However, even if we look beyond the underlying complaints to clarifications that the emissions were intermittent, we still conclude that they are alleged to have commenced before the retroactive date of September 29, 2008. In their response to the motion for judgment on the pleadings, the four underlying plaintiffs, while clarifying the intermittent nature of the emissions, did not retract the allegations that the emissions began in 1994. Similarly, the Cook County order striking references to the continuity of emissions leaves intact the pleading that the earliest emissions occurred in 1994. Medline's memorandum in response to Illinois Union's motion for judgment on the pleadings disputes only that the emissions were one continuous event, not that those emissions began in 1994. In sum, the allegation that the emissions were intermittent does not avoid the bar of the retroactive date, because the emissions nevertheless "first commenced" prior to the retroactive date.

¶ 41          2. *Construction of the Policy Definition of "Pollution Condition"*

¶ 42     To avoid the bar of the retroactive date and effectively convert the policy into one affording full retroactive coverage, Medline argues that each separate release of EtO is a new "pollution condition." Thus, Medline reasons that pollution conditions occurring after the retroactive date are covered under the policy. Illinois Union argues that the underlying complaints do not specifically allege that any emissions occurred after the retroactive date. This argument is specious, as the complaints allege that, "[s]ince 2008, Medline has used and continues to use EtO for medical device sterilization at the Waukegan facility."

¶ 43     The policy defines "pollution condition" as "[t]he discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant *** into *** the atmosphere, surface water, or groundwater." Medline argues that "discharge, dispersal, release, escape, migration, or seepage" must be read in the disjunctive, so that each separate discharge, dispersal, release, etcetera of EtO constitutes a new pollution condition.

¶ 44     Medline relies on *Ackley v. Paramus Board of Education*, No. L-4653-09, 2012 WL 634359 (N.J. Super. Ct. App. Div. Feb. 29, 2012) (*per curiam*), an unreported New Jersey case. Even if we consider *Ackley* as persuasive authority, it is inapposite. In *Ackley*, Illinois Union insured a school board for damages arising out of pesticide contamination. *Ackley*, 2012 WL 634359 at *1. The retroactive date of the policy was July 1, 2005. *Ackley*, 2012 WL 634359, at *2. In December 2006, the school discovered pesticide-contaminated soil on its property. *Ackley*, 2012 WL 634359, at *2. The policy defined "pollution condition" as the "*discovery*, discharge, dispersal, release, escape, migration, or seepage" of any pollution, *inter alia*, into or upon land. (Emphasis added.) *Ackley*, 2012 WL 634359, at *2. Although Illinois Union agreed that the words contained in the definition of "pollution condition" should be read disjunctively, it contended that

no coverage existed if any single pollution condition existed before the retroactive date. *Ackley*, 2012 WL 634359, at *3. The New Jersey appellate court held that the inclusion of the word "discovery" in the definition of "pollution condition" meant that the school's discovery of a pollution condition after the retroactive date was covered. *Ackley*, 2012 WL 634359, at *5. Here, significantly, the definition of "pollution condition" does not contain the word "discovery." Nor is the date that the pollution condition was discovered an issue in our case.

¶ 45    In our case, even reading the words "discharge, dispersal, release, escape, migration, or seepage" in the disjunctive, they are all different ways of describing how a pollutant leaves a covered location. Those words do not say that the manner of the pollutant's leaving must be either intermittent or continuous. It is a pollutant leaving a covered location plus entering "on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater" that constitutes *a* pollution condition. The language does not say that entering "on, in, into, or upon" must be either intermittent or continuous. Thus, we determine that the emission of a pollutant from a covered location, either intermittently or continuously, constitutes *a* pollution condition.

¶ 46    The policy provides coverage for pollution conditions that "first commence, in their entirety, on or after the retroactive date." The words "first commence" and "in their entirety" cannot be ignored. See *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004) (we must assume, in construing an insurance policy, that every provision was intended to serve a purpose). "Commence" means "begin" or "start." Merriam-Webster Online *Dictionary*, https://www.merriam-webster.com/dictionary/commence (last visited Feb. 1, 2022) [https://perma.cc/TT3L-5YZU]. "Entirety" means "sum total" and "whole." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/entirety (last visited Feb. 1, 2022) [https://perma.cc/6A5M-359A]. Thus, the policy requires us to look at when the totality of the

emissions from the Waukegan facility started to determine whether they commenced before or after the retroactive date. Otherwise, Illinois Union is correct that we would be reading the retroactive date out of the policy. We are mindful that Medline purchased a policy containing a retroactive date rather than one affording full retroactive coverage. We cannot rewrite an insurance policy to suit a party's needs. *Vivify Construction, LLC v. Nautilus Insurance Co.*, 2017 IL App (1st) 170192, ¶ 28.

¶ 47     In its reply brief, Medline argues for the first time that "in their entirety" means pollution conditions caused by Medline "in their entirety." Thus, Medline concludes that the policy language does not require us to look at events prior to the retroactive date. Issues raised for the first time in a reply brief do not merit consideration. *Tivoli Enterprises, Inc. v. Brunswick Bowling & Billiards Corp.*, 269 Ill. App. 3d 638, 642 (1995). Forfeiture aside, we reject this argument. If we cannot look to events prior to the retroactive date, then the retroactive date is meaningless. Courts must not interpret an insurance policy in a manner that renders any policy provision meaningless. *Amico v. Allstate Corp.*, 2020 IL App (1st) 191421, ¶ 14. Medline's argument also requires us to read a limitation into the policy language that is not present—namely, that a pollution condition is an event that is caused entirely by the insured.

¶ 48     Medline's reliance on *Primrose Operating Co. v. National American Insurance Co.*, 382 F.3d 546 (5th Cir. 2004), misses the mark. In *Primrose*, the Senn family sued Primrose and another oil company, CADA, for polluting their ranch while operating oil and gas leases thereon. *Primrose*, 382 F.3d at 550. Primrose's insurer, National American Insurance Company (NAICO), originally agreed to defend Primrose under a reservation of rights, but then it denied coverage and refused to pay Primrose's legal bills. *Primrose*, 382 F.3d at 550-51. A jury in the Senn case awarded the Senns substantial damages against Primrose, and Primrose sued NAICO in state court for breach

of its alleged duty to defend Primrose in the Senn suit. *Primrose*, 382 F.3d at 551. NAICO removed the case to federal court, where a jury awarded Primrose damages. *Primrose*, 382 F.3d at 551. The district court denied NAICO's postjudgment motion, NAICO appealed, and the appellate court affirmed. *Primrose*, 382 F.3d at 551, 556.

¶ 49    The NAICO policy provided that injury or damage from a "pollution incident" must not be caused or contributed to by any pollution incident that commenced prior to the beginning of the policy period. *Primrose*, 382 F.3d at 556. "Pollution incident" was defined as an " 'occurrence consisting of any actual emission, discharge, release or escape of pollutant' " that results in environmental damage. *Primrose*, 382 F.3d at 554. The Senns' pleadings in the underlying case alleged a "wide variety" of negligent acts committed by Primrose and CADA without distinguishing which tortfeasor committed which acts. *Primrose*, 382 F.3d at 556. Nor did the Senns' pleadings allege when the pollution incidents occurred. *Primrose*, 382 F.3d at 557. The court noted that, from the pleadings alone, "it is fully possible that a pollution incident caused entirely by Primrose during NAICO's coverage resulted in an injury that is now completely indivisible from an injury resulting entirely from a pollution incident caused by CADA." *Primrose*, 382 F.3d at 557.

¶ 50    Here, the underlying plaintiffs alleged that the emissions of EtO from the Waukegan facility began in 1994 and continued at least to when the underlying lawsuits were filed in 2019 and 2020. Thus, the underlying complaints did not allege that the "pollution condition," as defined in the policy, commenced, in its entirety, after the retroactive date.

¶ 51    Medline's citation of *Tunnell Hill Reclamation, LLC v. Endurance American, Specialty Insurance Co.*, No. 2:15-CV-2720, 2016 WL 3689100 (S.D. Ohio July 12, 2016), also misses the mark. In *Tunnell Hill*, the Ohio federal district court denied the insurer's motion for judgment on

the pleadings, finding that the policy term "pollution conditions" was ambiguous. *Tunnell Hill*, 2016 WL 3689100, at *5. Here, Medline does not contend in its briefs that the policy language is ambiguous.[2] Lastly, Medline cites an unreported decision of a Massachusetts trial court. We decline to discuss that case, as decisions of trial courts of foreign jurisdictions have no precedential value in Illinois disputes. *Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.*, 210 Ill. App. 3d 231, 242 (1991).

¶ 52    Illinois Union contends that pollution occurring over many years from a single source is treated as a single pollution event, citing this court's opinion in *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 283 Ill. App. 3d 630 (1996). In *Outboard Marine*, the plaintiff polluted Waukegan Harbor from 1953 to 1976 by periodically discharging PCBs. *Outboard Marine*, 283 Ill. App. 3d at 635. The plaintiff sued its insurance carriers, alleging a duty to defend and indemnify in connection with federal litigation. *Outboard Marine*, 283 Ill. App. 3d at 637. The trial court found that the plaintiff's multi-year contamination constituted a "single continuing occurrence" for purposes of the defendant's policy and apportioned damages among the insurers, including the defendant. *Outboard Marine*, 283 Ill. App. 3d at 638-39. On appeal, we noted that the defendant's policy was a comprehensive general liability policy (CGL). *Outboard Marine*, 283 Ill. App. 3d at 640. Under that policy, the defendant agreed to pay " 'all sums' " that the plaintiff was obligated to pay " 'on account of' " property damage " 'arising out of any one occurrence.' " *Outboard Marine*, 283 Ill. App. 3d at 640. The policy defined "occurrence" as " 'an accident or a happening

---

[2] At oral argument, Medline argued that the policy definition of "pollution condition" is ambiguous. We deem this argument forfeited. Issues cannot be raised for the first time at oral argument. *Spirn v. Joseph*, 144 Ill. App. 3d 127, 130 (1986).

or event of a continuous or repeated exposure to conditions which unexpectedly or unintentionally' " results in property damage. *Outboard Marine*, 283 Ill. App. 3d at 640. The policy contained an exclusion for property damage from the discharge of contaminants or pollutants, but there was an exception for discharge that was " 'sudden and accidental.' " *Outboard Marine*, 283 Ill. App. 3d at 638. This court affirmed the trial court's finding that the plaintiff's periodic contamination constituted a single continuing occurrence. *Outboard Marine*, 283 Ill. App. 3d at 642.

¶ 53    Medline argues that *Outboard Marine* is distinguishable from our case. We agree that the case is distinguishable but disagree that it is relevant. First, *Outboard Marine* concerned a CGL, rather than a pollution, policy. Indeed, the defendant's policy in that case contained a pollution exclusion. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 125-26 (1992); *Outboard Marine*, 283 Ill. App. 3d at 638. Second, the definition of "occurrence" in the CGL policy included "continuous or repeated" exposure to conditions resulting in property damage. Here, the definition of "pollution condition" contains no such language. For the same reasons, Illinois Union's reliance on *Missouri Pacific R.R. Co. v. International Insurance Co.*, 288 Ill. App. 3d 69 (1997), is also misplaced. Thus, those cases neither inform nor impact our analysis, except to the extent that they provide examples of continuous exposures that are also periodic.

¶ 54    Moreover, Medline ignores that the underlying complaints in our case allege that the "majority" of Medline's emissions are not from a "controlled source," but are "fugitive" emissions. Thus, Medline's reliance on *Konell Construction & Demolition Corp. v. Valiant Insurance Co.*, No. CV03-412-MO, 2006 WL 1360956 (D. Or. May 15, 2006), is misplaced. In *Konell*, the Oregon federal district court ruled that a "pollution incident"—which was defined as the " 'emission, discharge, release, or escape of "pollutants" ' " at a work site—could plausibly mean that separate

dump truck loads of contaminated soil were separate pollution incidents. *Konell*, 2006 WL 1360956, at *4. The court noted that "each delivery of a dump truck load of contaminated soil is naturally divisible from the others." *Konell*, 2006 WL 1360956, at *4. Here, because of the fugitive emissions, we cannot say that each emission is "naturally divisible" from all the others.

¶ 55    Medline next argues that Illinois Union's choice not to include aggregating language in the definition of "pollution condition," but to include such language elsewhere in the policy, requires us to construe "pollution condition" to mean that each emission is a separate pollution condition. Section II of the policy is labeled "Limits of Liability and Self-Insured Retention." Medline's self-insured retention, *i.e.*, deductible, was $500,000. Section IIB of the policy provides that "[o]ne 'self-insured retention' shall apply to all 'loss' *** arising out of the same, continuous, repeated, or related 'pollution condition.'" Section IID provides that "the most the Insurer shall pay for all 'loss' arising out of the same, continuous, repeated, or related 'pollution condition' " is the limit of liability identified elsewhere in the policy. Medline argues that, by using different language in different sections of the policy, Illinois Union intended the language to mean different things. See *Taracorp, Inc. v. NL Industries, Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) (the choice of substantially different words in a contract to address analogous issues signifies a different approach). Medline argues that Illinois Union, had it so intended, could have used aggregating language in defining "pollution condition," citing a string of unreported foreign cases where insurers included such language in defining a pollution condition.

¶ 56    Medline relies on *MHM Correctional Services, Inc. v. Evanston Insurance Co.*, 2021 IL App (1st) 200552-U. In *MHM*, the plaintiffs provided health care services within correctional institutions. *MHM*, 2021 IL App (1st) 200552-U, ¶ 4. The underlying lawsuits against the plaintiffs for various health care violations did not request monetary damages but instead prayed for health

care services. *MHM*, 2021 IL App (1st) 200552-U, ¶¶ 9, 14. The appellate court held that the defendant insurer had a duty to defend. *MHM*, 2021 IL App (1st) 200552-U, ¶ 46. The policy provided that the insurer had a duty to defend any " '[c]laim,' " in contrast to a different policy provision that provided that self-insurance applied to any claim " 'seeking [d]amages.' " (Emphasis omitted.) *MHM*, 2021 IL App (1st) 200552-U, ¶ 45. The court concluded that the use of different language in the two provisions indicated that the parties intended the language to mean different things. *MHM*, 2021 IL App (1st) 200552-U, ¶ 45.

¶ 57 Medline also relies on *Mutual Fire, Marine & Inland Insurance Co. v. Vollmer*, 508 A.2d 130 (Md. 1986), *Duke University v. Endurance Risk Solutions Assurance Co.*, No. 5:20-CV-672-BO, 2021 WL 2345014 (E.D.N.C. June 8, 2021), and *Ball v. NCRIC, Inc.*, 120 F. App'x 965 (4th Cir. 2005) (*per curiam*). In *Vollmer*, the court held that coverage existed because of an ambiguity created by the claims-made provision of the insurance policy and an exclusion thereto. *Vollmer*, 508 A.2d at 133-34. In *Duke University*, the district court found that coverage existed where there was a conflict between the policy and an endorsement and because the law provided that the endorsement prevailed. *Duke University*, 2021 WL 2345014, at *3. *Vollmer* and *Duke University* are, thus, inapposite.

¶ 58 In *Ball*, the plaintiff obtained a judgment against a doctor named Daniel, who injected the plaintiff with drugs and sexually assaulted her. *Ball*, 120 F. App'x at 966. The plaintiff sued the defendant, which insured Daniel, seeking to satisfy the judgment. *Ball*, 120 F. App'x at 966. The defendant argued against coverage on the basis that Daniel knew, or should have known, about the plaintiff's claim when the policy was issued. *Ball*, 120 F. App'x at 970. By the time the policy was issued, Daniel had administered drugs to the plaintiff multiple times and had sexually assaulted her at least once. *Ball*, 120 F. App'x at 971. The plaintiff argued in favor of coverage because

Daniel also assaulted her after the policy was issued. *Ball*, 120 F. App'x at 972. The policy provided coverage for claims caused by a " 'medical incident.' " *Ball*, 120 F. App'x at 972. The policy provided that all related acts or omissions shall be considered " 'one' " medical incident. *Ball*, 120 F. App'x at 972. Because of this aggregating language, the court held that Daniel reasonably should have known about the medical incident, which included the totality of Daniel's behavior, before and after the policy was issued. *Ball*, 120 F. App'x at 972.

¶ 59    We do not doubt the soundness of Medline's arguments that an insurer can include aggregating language in a definition or that the use of different language in parallel provisions of a policy is interpreted to mean different things. What Medline ignores is that section IA of the policy at issue contains such aggregating language. Medline would have us stop reading after the definition of "pollution condition." However, section IA further provides that coverage applies only to "pollution conditions" that "first commence, in their entirety, on or after the retroactive date." "Entirety" is the aggregating language. As discussed, "entirety" in this context means the totality of the emissions from the Waukegan facility. Just as the court in *Ball* was obliged to look at the totality of Daniel's behavior, so are we obliged by the policy to look at the totality of the releases of EtO.

¶ 60    Medline argues that the "entirety" language in the policy is not aggregating language, because it "says nothing about whether repeated emissions constitute only one" such pollution condition. Medline cites no Illinois or other authority for the proposition that magic language is required. When insurance policies do not define terms, courts give them their plain, ordinary, and popular meanings, looking to their dictionary definitions. *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 366 (2006). Here, "entirety" means "sum total" or "whole." See *supra* ¶ 46. A synonym for "sum total" is "aggregate." Merriam-Webster Online Thesaurus,

https://www.merriam-webster.com/thesaurus/sum%20total (last visited Feb. 1, 2022) [https://perma.cc/67AE-N2CB].

¶ 61    Medline posits, however, that aggregating language does not always mean that separate releases of pollutants constitute a single occurrence, citing *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407 (2006). In *Nicor*, Nicor paid $90 million to remediate mercury contamination in 1070 homes from which it had removed mercury-containing regulators. *Nicor*, 223 Ill. 2d at 413. Nicor looked to its insurers for reimbursement. *Nicor*, 223 Ill. 2d at 413. Each insurer except Lloyd's of London (London) settled with Nicor. *Nicor*, 223 Ill. 2d at 413. London's policies required it to indemnify Nicor for sums that Nicor paid for remediation to 195 homes, for property damage growing out of an " 'occurrence.' " *Nicor*, 223 Ill. 2d at 413. "Occurrence" was defined in policies London issued earlier as " 'one happening or series of happenings arising out of or due to one event taking place during the term of this contract.' " *Nicor*, 223 Ill. 2d at 413. In later policies, "occurrence" was defined as an accident or event or " 'continuous or repeated exposure to conditions' " resulting in bodily injury, personal injury, death, or property damage. *Nicor*, 223 Ill. 2d at 413. If each of the 195 mercury spills covered by London's policies constituted a separate occurrence, London would owe Nicor nothing, because of Nicor's deductible. *Nicor*, 223 Ill. 2d at 414. On the other hand, if the spills constituted a single occurrence, London's payout would be substantial. *Nicor*, 223 Ill. 2d at 414.

¶ 62    The trial court granted summary judgment in Nicor's favor, finding that Nicor's systematic failure to safely remove the regulators resulted from a single occurrence. *Nicor*, 223 Ill. 2d at 415. The appellate court reversed. *Nicor*, 223 Ill. 2d at 415. The appellate court held that damages due to mercury contamination were caused by separate and independent acts of Nicor's servicemen in an isolated number of cases. *Nicor*, 223 Ill. 2d at 415.

¶ 63 Our supreme court noted that London's policies were commercial liability policies. *Nicor*, 223 Ill. 2d at 418. The court also noted that the definition of "occurrence" used in the London policies was typical of commercial liability policies and that the Illinois Appellate Court in many cases had adopted the "cause theory" to determine the number of "occurrences" under a commercial liability policy. *Nicor*, 223 Ill. 2d at 418. Under the "cause theory," the number of occurrences is determined by referring to the cause or causes of the damage. *Nicor*, 223 Ill. 2d at 418. This is in contrast to the "effect theory," which determines the number of occurrences by looking at how many individual claims or injuries resulted from the occurrence. *Nicor*, 223 Ill. 2d at 418. Interpreting London's commercial liability policies, our supreme court held that the appellate court's approach was sound. *Nicor*, 223 Ill. 2d at 432. The supreme court reasoned that the mercury spills occurred at different times over 17 years, no temporal or geographical pattern to the spills was established, and no particular technician or group of technicians was responsible for the spills. *Nicor*, 223 Ill. 2d at 434. The supreme court concluded that "[t]o say that each of the 195 spills emanated from a single cause would *** be completely untenable." *Nicor*, 223 Ill. 2d at 434.

¶ 64 *Nicor* is inapplicable to our case because the supreme court's analysis was particular to commercial liability policies. Here, the policy is a premises pollution liability policy. The two types of policies are not interchangeable, as shown by the evolution of the pollution exclusion in commercial liability policies. Broadly, after courts interpreted "accident" in commercial liability policies to encompass pollution-related injuries, the insurance industry added an endorsement and then language to standard commercial liability policies excluding coverage for injuries caused by contaminants or pollution. See *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 489-93 (1997).

¶ 65 Medline next argues that, for Illinois Union to avoid coverage, it had to specifically exclude coverage for EtO emissions. This is so, Medline asserts, because Illinois Union knew that Medline sought coverage for claims relating to its emissions. Medline contends that Illinois Union "misuses" the retroactive date to deprive Medline of the coverage that it "reasonably understood it was buying." Medline relies on *Indiana Insurance Co. v. Royce Realty & Management, Inc.*, 2013 IL App (2d) 121184. However, that case is inapposite. In *Indiana*, Indiana knew that Royce Realty was in the business of providing property management services to a variety of commercial properties, including golf courses. *Indiana*, 2013 IL App (2d) 121184, ¶ 33. The potential for accidents giving rise to lawsuits was inherent in Royce Realty's business. *Indiana*, 2013 IL App (2d) 121184, ¶ 33. Nevertheless, Indiana issued Royce Realty a CGL policy, which is a type of policy intended to protect against risks associated with business operations. *Indiana*, 2013 IL App (2d) 121184, ¶ 33. Cathy Stackhouse was injured when a tree at Lakemoor Golf Club, one of the entities that Royce Realty managed, fell on her. *Indiana*, 2013 IL App (2d) 121184, ¶ 13. Indiana posited that the policy did not cover the Stackhouse claim because of a policy endorsement limiting coverage to those operations taking place at Royce Realty's offices. *Indiana*, 2013 IL App (2d) 121184, ¶ 18. Indiana argued that this endorsement converted the CGL policy into a premises liability policy. *Indiana*, 2013 IL App (2d) 121184, ¶ 33. Noting that Indiana "chose" to insure Royce Realty under a CGL policy, knowing the risks, and then attempted to convert the policy into one leaving such risks without coverage, we held that the premises endorsement did not "put the insured on notice that the fundamental nature of the policy had changed and that most of the coverage under the CGL policy was nullified." *Indiana*, 2013 IL App (2d) 121184, ¶ 33. In these circumstances, we said that, if an insurer does not intend to insure against a risk inherent in the insured's business, the insurer " 'should expressly exclude that risk from the coverage of the

policy.' " *Indiana*, 2013 IL App (2d) 121184, ¶ 33 (quoting *Dash Messenger Service, Inc. v. Hartford Insurance Co. of Illinois*, 221 Ill. App. 3d 1007, 1014 (1991)).

¶ 66    The facts in *Indiana* are far remote from our case. Here, Medline got the coverage that it paid for. Medline opted for a policy with a retroactive date rather than one affording coverage for emissions retroactive to the beginning of time. Medline cannot plead ignorance of the difference in these policy coverages because Endorsement 019 to the policy shows that Medline purchased "Full Retro" coverage on another covered location. Also, there is nothing in the policy language of section IA that is misleading or ambiguous, nor does Medline so argue in its briefs.

¶ 67    Illinois Union argues that Medline asks us to "cast aside" the policy language and to invoke the "reasonable expectations doctrine," which Illinois does not recognize. Under the "reasonable expectations doctrine," the objectively reasonable expectations of all applicants and intended beneficiaries of an insurance contract will be honored even where the policy provisions would negate those expectations. *Continental Casualty Co. v. Howard Hoffman & Associates*, 2011 IL App (1st) 100957, ¶ 76. *Howard Hoffman* noted that some Illinois courts have rejected the doctrine while others seem to have accepted it, terming the doctrine's application in Illinois "an open question." *Howard Hoffman*, 2011 IL App (1st) 100957, ¶¶ 77-78.

¶ 68    Medline denies raising the reasonable expectations doctrine. Nevertheless, even if we were inclined to accept the doctrine, we would decline to apply it to this case. As noted, the policy language is unambiguous, and Medline does not argue to the contrary. Medline does not point to any facts indicating that it misunderstood the meaning of the retroactive date when it purchased the policy. There is simply nothing in the record to indicate that Medline's expectations were not met. According to the asset purchase agreement between Medline and its predecessor, Medline knew that its predecessor released EtO from the Waukegan facility. Thus, Medline knew that its

own risk predated its purchase of the facility. Medline could have purchased a "full retro" policy that would have protected it against pollution conditions commencing prior to the retroactive date (see *Kim*, 507 F.3d at 1082 (for prior acts, a policy may provide full retroactive coverage)), but it chose not to do so. Now, faced with multiple lawsuits alleging pollution conditions prior to the retroactive date, Medline wants to convert its policy into one with full retroactive coverage. Medline may not do so. It is well established that, where terms of a contract are clear and unambiguous, they must be enforced as written, and courts cannot rewrite a contract to provide a better bargain to suit one of the parties. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 349-50 (2000).

¶ 69          3. *Whether Emissions Before the Retroactive Date are Relevant*

¶ 70    Medline argues that emissions from the Waukegan facility prior to September 29, 2008, which was when Medline purchased the facility, are irrelevant because Medline cannot be held liable for injuries caused by those prior emissions. Medline emphasizes that the underlying plaintiffs sued Medline only for those emissions occurring after Medline acquired the Waukegan facility. When we examine the underlying complaints, we see that the underlying plaintiffs included allegations of prior emissions (1) as background information, (2) to demonstrate that the plaintiffs were unknowingly exposed to the cancer-causing pollutant over time, and (3) to show that Medline knew, or should have known, that its emissions endangered the health of the surrounding community and that of the plaintiffs. The allegations of emissions that occurred before Medline acquired the Waukegan facility were material to state a cause of action for willful and wanton conduct (see *Majewski v. Chicago Park District*, 177 Ill. App. 3d 337, 340 (1988) (willful and wanton conduct requires a conscious disregard for the safety of others)) and are material.

¶ 71    Nevertheless, whether Medline could be found liable for such prior emissions is immaterial to the determination of whether the policy affords coverage. Under the rule in *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 196 (1976), it is " 'generally inappropriate for a court considering a declaratory judgment action to decide issues of ultimate fact that could bind the parties to the underlying litigation.' " (Internal quotation marks omitted.) *Sentry Insurance v. Continental Casualty Co.*, 2017 IL App (1st) 161785, ¶ 43 (quoting *Landmark American Insurance Co. v. NIP Group, Inc.*, 2011 IL App (1st) 101155, ¶ 59).[3]

¶ 72    Medline cites no case holding that we may consider its underlying liability in determining whether a duty to defend or indemnify exists. Instead, Medline relies on Illinois cases that state the uncontroversial axiom that courts compare the underlying allegations with the terms of the insurance policy. We performed that analysis above and concluded that the policy affords no coverage.

¶ 73    Medline additionally relies on *Scheer v. State Farm Fire & Casualty Co.*, 708 So. 2d 312, (Fla. Dist. Ct. App. 1998), for the proposition that we look only at those allegations in the underlying pleadings pertinent to the insured. In *Scheer*, the underlying complaint alleged four tort claims against the insured, Scheer, but also alleged that Scheer committed those torts in the course of his employment. *Scheer*, 708 So. 2d at 312-13. The court held that only those counts against Scheer individually were pertinent in determining whether Scheer's insurer owed a duty to defend. *Scheer*, 708 So. 2d at 313. Nothing in *Scheer* is inconsistent with the trial court's ruling in the

_____

[3] Application of the *Peppers* doctrine resulted in the trial court in our case reconsidering, and vacating, its ruling that a genuine issue of material fact precluded entry of judgment on the pleadings.

instant case. Here, as noted, the underlying allegations that emissions occurred prior to Medline's ownership of the Waukegan facility are pertinent to the willful and wanton causes of action against Medline. Consequently, we reject this argument.

¶ 74      4. *Whether a Fact Issue Precluded Judgment in Favor of Illinois Union*

¶ 75     Medline contends that whether the emissions were continuous, in the sense that they were unabated, or whether they were intermittent is a fact question that precludes judgment on the pleadings. See *Hartlett v. Dahm*, 94 Ill. App. 3d 1, 4-5 (1981) (trial court erred in granting judgment on the pleadings where material issues of fact existed). Regardless of which party first raised this specter of "continuous" versus "intermittent," it has no bearing on whether Illinois Union owes Medline a defense. As discussed, the allegations in the underlying complaints that emissions occurred at the Waukegan facility since 1994 means that those emissions did not commence, in their entirety, after the retroactive date, regardless of whether those emissions were continuous or intermittent.

¶ 76     Medline posits that the allegations in the underlying complaints of continuous emissions are ambiguous and must be construed in Medline's favor. We reject this argument because, as noted, the continuous-intermittent controversy is irrelevant. Accordingly, for all of the above reasons, we hold that the court properly granted Illinois Union's motion for judgment on the pleadings. Because we determine that no duty to defend or indemnify arises under the present facts, we also hold that the court properly dismissed with prejudice Medline's second amended counterclaim.

¶ 77                          III. CONCLUSION

¶ 78     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 79     Affirmed.

---

**No. 2-21-0175**

---

| | |
|---|---|
| **Cite as:** | *Illinois Union Insurance Co. v. Medline Industries, Inc.*, 2022 IL App (2d) 210175 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 19-MR-1026; the Hon. Luis A. Berrones, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | John S. Vishneski III, Stanley C. Nardoni, and Adrienne N. Kitchen, of Reed Smith LLP, of Chicago, Lowndes Christopher Quinlan, of McGuireWoods LLP, of Charlotte, North Carolina, and Sean A. McClelland, of McGuireWoods LLP, of Washington, D.C., for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | James J. Sanders, Matthew J. Dostal, Alexander W. Ross, and Ryan M. Murnighan, of Clyde & Co US LLP, of Chicago, for appellee. |

---